HELEN TANEIAN, PLAINTIFF-APPELLANT, v. KOSROF M. MEGHRIGIAN AND CHARLES J. NAJARIAN, DEFENDANTS-RESPONDENTS.

Argued March 1, 1954—Reargued March 22, 1954—Decided May 3, 1954.

Mr. *George J. Kaplan* argued the cause for appellant (*Mr. Louis Steisel,* attorney).

Mr. *Elmer J. Bennett* argued the cause for respondents (*Messrs. James P. Beggans* and *Richard H. Hughes* on the brief; *Messrs. Carpenter, Gilmour & Dwyer,* attorneys).

The opinion of the court was delivered by

HEHER, J. On February 26, 1950 plaintiff suffered injury as the result of a fall on a common stairway of a four-story apartment house situate at 301 52nd Street, in West New York, New Jersey, owned and operated by defendants. The building housed 14 families. The defendant Najarian and his family occupied a third-floor apartment, to which access was had by two flights of stairs. The stairway from the first to the second floor was in two sections, connected by a landing. The mishap occurred shortly before midnight as the plaintiff was descending the first section of the stairway leading from the second to the first floor, after a social evening with the Najarians. The fall is attributed primarily to the culpable failure of lighting facilities installed by defendants.

Plaintiff and her daughter Beatrice arrived at the apartment house between 7:30 and 8:00 P. M. There was lighting on the first and third floors, but none on the second floor, as they ascended the stairway; and this was the case as they descended the stairs after leaving the Najarian apartment, the plaintiff preceding her daughter. Plaintiff had frequently visited the Najarians, and was familiar with the *locus*. She testified that on the second step down from the second floor she "fell," although she was then "holding on to the banister"; her "feet slided," "slipped"; when they ascended the stairway, the first and third floors were "in light, second floor dark"; on the descent, the third-floor light "is on," the second floor light "is out," it was "all dark," she "couldn't see." Beatrice said that on ascending the stairway she observed that the "fluorescent fixture * * * was out," and "with the light off," she could not "see" her way and made "use of the handrail alongside of the staircase," and on the way down from the second floor, she "could not see the stairway." And when they entered the Najarian apartment, she remarked to the defendant Najarian that "the second floor landing light was out, the second floor light"; and he replied that "he would have it attended to and he would take care of it." Najarian, she said, was "in and out" of the apartment "all evening"; "there were occasions when perhaps he went out for a moment or two." Her mother said she heard the conversation. Najarian did not "remember a conversation of that sort"; he denied the second floor was without light, but he acknowledged that when he descended the stairway between 8:30 and 9:30 P. M., after plaintiffs' arrival, the second floor light was "flickering on and off," as had been the case for at least two days previously; he did nothing when he first noticed the "flickering" two days before because "it wasn't necessary, there was plenty of illumination"; he would "change it if it got worse," and this he, himself, did "a few days later" by placing a new bulb in the one-light fixture. By "flickering," he meant "continuous flickering on and off—not on and off, it doesn't go off at all; it flickers; it just gets dull and bright." It

was his "custom to have the lights burning on all of the floors all night." As he bade his guests good-night at his apartment door, he did not have a view of the second floor, and so he could not know whether the second floor light was "flickering or whether it was on or whether it was off."

The trial judge directed a verdict for defendants at the close of the case; and the judgment thereon was affirmed by the Appellate Division. 27 *N. J. Super.* 177 (1953). The ground of the affirmance was that plaintiff, as a social guest of the Najarians, was but a licensee and, "therefore, bound to take the property as she found it," and defendants were under a duty merely "to give notice of unforeseen dangers such as traps and to abstain from wilful and wanton acts of negligence."

The case is here by certification on plaintiff's motion. 14 *N. J.* 12.

## I.

The question is one of duty, and duty is measured by the relation between the parties.

The defendants had common ownership and possession of the apartment house; and it is urged that the "social guest" doctrine "should not be applied nor extended" to "a resident co-owner of a multiple family dwelling with regard to the common stairways and halls under the custody and control of the owners."

This involves an inquiry not free of complexity. Lord Buckmaster speaks of the varying duty underlying the liability in tort of the owner or occupier to those who make use of his lands: "being lowest to the trespasser; next to a licensee, and greatest to a person whose position owing to the deficiencies of the English language is described by lawyers as an 'invitee,' meaning persons invited to the premises by the owner or occupier for purposes of business or of material interest." *Fairman v. Perpetual Investment Society* (1923), *A. C.* 74, 80. There, the defendants owned a block of flats which they let to various tenants, the defendants retaining possession and control of the common staircase

giving access to the flats. The plaintiff, who lodged with her sister in a flat on an upper floor, of which her sister's husband was a tenant, while descending the stairs, caught her heel in an irregular depression caused by wear, and fell and was injured. And the holding was that there was no contractual relation between her and the landlord, but she was nevertheless, as between herself and the landlord, entitled to use the staircase to gain access to premises which he had demised to a tenant with an implied right of use by the tenant and all persons lawfully resorting to the tenant's premises, and as such user was the invitee of the tenant, and, in consequence, the licensee of the landlord, and thus the landlord's only duty to the plaintiff was not to expose her to a concealed danger or trap. The case distinguishes between liability arising from a contractual obligation, between landlord and tenant, ordinarily giving rise to no rights in favor of strangers to the contract, and liability in tort for the redress of a breach or violation of duty or the infringement of a right recognized by the law, a "wrong unconnected with contract," to take the definition of Chitty. *Vide Jaggard on Torts*, 2. Compare *La Freda v. Woodward*, 125 *N. J. L.* 489 (*E. & A.* 1940). In an earlier English case, recovery was denied to an employee of a tenant in an office building, who was injured in a fall on an unlit staircase. The letting agreements had no provision with regard to the lighting of the staircase; and the holding was that there was no duty toward the plaintiff imposed upon the defendant to light the staircase. *Huggett v. Miers* [1908], 2 *K. B.* 278.

There are cases in the Scottish courts holding that where the landlord retains possession and control of a common staircase, his duty to the public is to keep it reasonably safe. *Kennedy v. Shotts Iron Co.*, 1913 *S. C.* 1143; *Grant v. John Fleming & Co.*, 1914 *S. C.* 228. As to this, Lord Buckmaster, in the *Fairman* case, said:

"Whether such a duty is one that it might be reasonable to impose upon landlords is not a matter which this House has to consider. The question is—does such a duty exist? It may well arise by the implied obligation between the landlord and tenant giving the tenant

rights if the obligation be broken, but as between the landlord and the persons who use the staircase for business purposes or because of a material interest no such contractual obligation can be established."

The duty to be sought, he continued, must be found outside contract. And this duty "does not involve a guarantee as to the safety of premises nor obligation to keep them in repair," but concerns "a danger which is not obvious to a person lawfully using the premises, either on business or having a material interest in their use, and exercising ordinary care and possessing ordinary powers of observation," and "then the landlord is responsible for any accident that may occur," and the "degree of danger, and the extent to which it is concealed, may vary from case to case, and its ultimate determination is a question of fact for which a jury is an appropriate tribunal." In a word, the lodger in that case used the staircase, not under contract with the landlord, but rather with his permission, as the invitee of the tenant and the licensee of the landlord.

In a case decided by the English Court of Appeal just a few months ago, the owner of a house requisitioned by the Coulsdon and Purley Urban District Council under authority from the Ministry of Health, for the relief of persons inadequately housed, was, by agreement with the Council, allowed to enter into occupation of the upper floor. A friend came to visit her when she became ill, arriving a half-hour before dark; the visitor, in leaving, lost her footing on broken steps of an unlighted porchway. She was held to be a licensee; and the injury was found actionable as the consequence of the defective condition of the steps, which, combined with the insufficiency of light, amounted to a concealed and unusual danger. *Hawkins v. Coulsdon and Purley Urban District Council* (1954), 2 *W. L. R.* 122.

In New Jersey, it is settled law that one who "by invitation, express or implied, induces persons to come upon his premises," as distinguished from an entry by mere license or sufferance, owes to the invitee the duty to exercise "ordinary care to render the premises reasonably safe" for the

intended use, and to abstain from any act that would make the use dangerous. This on the ground that "the person injured did not act merely on motives of his own, to which no act or sign of the owner or occupier contributed, but that he entered the premises because he was led by the acts or conduct of the owner or occupier to believe that the premises were intended to be used in the manner in which he used them, and that such use was not only acquiesced in, but was in accordance with the intention or design for which the way or place was adapted and prepared or allowed to be used"; the proof in this regard "must be found in the circumstances of the particular case," and if there be evidence tending to show inducement or invitation, "it becomes a question of fact for the jury whether the conditions exist under which a legal duty is imposed upon the owner of the premises to exercise care for the plaintiff's safety." *Phillips v. Library Co.*, 55 *N. J. L.* 307 (*E. & A.* 1893). Citing the English case of *Corby v. Hill* (1858), 4 *C. B.* (*n. s.*) 556, Justice Depue suggested a distinction between "mere negligence to keep the premises in repair and acts of misfeasance, such as placing obstructions or dangerous pitfalls in a way which persons have been permitted to use with the consent of the owner or on his implied invitation." But one who comes upon the land under a bare license or by sufferance must take the premises as they are; the occupier is not duty bound to render the premises safe for the use of the licensee, but merely to give warning of any concealed danger known to the occupier, and to abstain from "creating any condition upon the premises which to one of ordinary prudence and foresight could be reasonably held to be a dangerous instrumentality for harm." *Morril v. Morril*, 104 *N. J. L.* 557 (*E. & A.* 1928). There, the court of last resort ruled that a "social guest" of the occupier is a bare licensee who is entitled only to the "same care" that his host "takes of himself, and the other members of his family, and no more"— citing the English case of *Southcote v. Stanley*, 1 *H. & N.* 247; 25 *L. J. Exch.* 339 (1856). The duty of abstention from "any active wrongdoing" proceeds on the hypothesis

there deemed well founded that he "who is receiving the gratuitous favors of another has no such relation to him * * * as to create a duty to make safer or better than it happens to be the place where hospitality is tendered; the licensee must take the premises as he finds them. At most he can claim only that the licensor shall abstain from entrapping him; shall not create new and undisclosed courses of danger without warning him of the change of situation." Again, the doctrine of the English case of *Corby v. Hill* is invoked. And it was applied in the later case of *Lewis v. Dear*, 120 *N. J. L.* 244 (*E. & A.* 1938).

It is a corollary of this principle that the gratuitous licensee's awareness of the peril is an absolute bar to recovery: for the occupier's liability is predicated on the concealment of the danger from the licensee. In the case of an invitee, the occupier is under a duty of care to render the premises reasonably safe, and there is a breach of the duty when under the occupier's invitation persons come upon land which the occupier knows or ought to know has elements of danger, notwithstanding the invitees are themselves aware of the risk of harm, although contributory fault may bar recovery for a breach of the duty. But in the case of a gratuitous licensee, there is no breach of duty if the licensee also knows of the hazard, or the risk of injury would be obvious to a reasonably prudent person. These rules of status and duty are embedded in the common law.

Yet this is not to say that there is no liability for injury to the gratuitous licensee for the negligent conduct of the occupier or his servants in the things done on the land.

It was the original concept that an occupier owed to a licensee the duty to warn only of dangers *actually known* to the occupier, but to an invitee the occupier was under a duty to warn him, not only of dangers of which the occupier actually knows, but also of those of which he *ought to know. Gautret v. Egerton, L. R.* 2 *C. P.* 371 (1867); *Indermauer v. Dames* (1866), *L. R.* 1 *C. P.* 274. In earlier days, where a licensee was injured by the negligent conduct of the occupier or his servants in the course of things done on the land,

recovery would have been defeated by the doctrine of common employment, then applicable not only to servants but licensees and volunteers as well, presumably on the supposition of an agreement to accept the risk of negligence on the part of the occupier's servants. *Southcote v. Stanley,* cited *supra*; *Degg v. Midland Ry. Co.* (1857), 1 *H. & N.* 773. But this was a false assumption: and it was ultimately conceded that a licensee can always sue for negligence in the course of things done on the land; his disability relates to the static condition of the premises, expressed in the doctrine that the licensee must take the premises as he finds them. *Dunster v. Abbott* (1954), 1 *W. L. R.* 59; (1953), 2 *All E. R.* 1572. The servant analogy was followed by the analogy of a gift; and the occupier was held liable to a licensee for a negligent act of commission. *Gautret v. Egerton,* cited *supra; Corby v. Hill,* cited *supra.*

And it is now suggested in England that, as to licensees, there is no longer any valid distinction to be drawn between negligent acts of commission and acts of omission. In the cited case of *Hawkins v. Coulsdon and Purley Urban District Council,* Denning, L. J., said:

"It always was an illogical distinction. Many acts of commission can be regarded as acts of omission and *vice versa.* It all depends on how you look at it. Thus, in *Corby v. Hill,* 4 *C. B.* (*n.s.*) 556, the negligent act was regarded as one of commission in placing slates on the road; but it might just as well have been regarded as an act of omission in failing to give warning of them at night by means of a red lamp. That is, indeed, how, Scrutton, L. J. regarded it in *Kimber v. Gas Light and Coke Co.,* [1918] 1 *K. B.* 439; 34 *T. L. R.* 260. It seems to me that the real significance of an act of commission is that it means that the occupier must have actual knowledge of the state of affairs he has created. Taking that significant feature and applying it to an act of omission, you will find that liability depends on whether the occupier has actual knowledge of the state of affairs existing on the land, no matter whether he himself created it or someone else. Once he has that knowledge, then if he knows or ought to know that it is a danger, he is under a duty to use reasonable care to prevent damage from that danger."

Here, also, it was acknowledged that a licensee "can never complain of dangers which are obvious or known to him."

Analogy was found in the cases involving children. Justice Denning continued:

"In the first place there are the cases about children who have been allowed to come on to the land and have meddled with things there. They are licensees. The question in such cases is whether the occupier has actual knowledge of the state of affairs existing on the land and the tendency of children to meddle. Once he has that knowledge, then if he knows or ought to know that it is a danger, or will be a danger if they meddle, then he is under a duty to use reasonable care to prevent damage from that danger; and this is so whether it arises from an act of omission or commission. That is, I think, fully established by *Cooke v. Midland Great Western Railway Co. of Ireland*, (1909) *A. C.* 229 (failure to lock a turntable), and many cases in this court down to *Pearson v. Lambeth Borough Council*, [1950] 2 *K. B.* 353 (failure to padlock a grille). In each case the acts complained of were acts of omission. In the words of Asquith, L. J.: 'a simple precaution was omitted which would have thwarted or rendered innocuous the possible actions of third persons.' The occupier negligently failed to take that precaution and was held liable. I do not think that there is any difference between a child licensee and an adult licensee except that a child will meddle where an adult will not, and this fact must be taken into account in deciding whether the occupier has been negligent."

Concluding, Justice Denning said:

"Thus far I have considered only the authorities; but when we come to consider the matter upon principle, it is clear that there should be no difference between an act of commission and an act of omission. If an occupier actually knows of a state of affairs on his land which a reasonable man would realize was a danger, he should not be allowed to escape from his responsibilities on the plea that he was not a reasonable man and did not realize it."

It has long been the rule in New Jersey that the retention of control of the stairways, passages and other common facilities of a multi-unit dwelling house lays upon the possessor the duty of reasonable care for safety in use; and the responsibility extends not alone to the individual tenant, but also to his family, servants and employees, business visitors, social guests, and the like: for those who enter in the right of the tenant, even though under his mere license, make a permissible use of the premises for which the common ways and facilities are provided. They come upon the land

by invitation of the landlord, as such facilities afford "to the tenants and those having lawful occasion to visit their apartments the right of passage to and fro"; the landlord is in this regard "under the responsibility of a general owner of real estate who holds out invitations or inducements to other persons to use his property"; the landlord's obligation "is that reasonable care and skill have been exercised to render the premises reasonably fit for the uses which he has invited others to make of them." *Gillvon v. Reilly,* 50 *N. J. L.* 26 (*Sup. Ct.* 1887), Dixon, J. While the plaintiffs there were tenants, it is to be observed that the invitation was deemed inclusive of the tenant's visitors.

And in a later case involving a claim for injury to a tenant's visitor, the principle was reaffirmed, citing the English case of *Miller v. Hancock* [1893], 2 *Q. B.* 177, as grounded in "necessity * * * for the beneficial enjoyment of the thing demised," since "the use of such rooms for dwellings equally necessitates the use of the passage by tradesmen in delivering goods, by persons having other business with the occupant or by those who visit him for social reasons. With respect, therefore, to all persons visiting such a tenant upon any lawful occasion, the duty of the landlord is similar to that which he owes to the tenant." *Gleason v. Boehm,* 58 *N. J. L.* 475 (*Sup. Ct.* 1896), Magie, J. But there what would now seem to be an unduly restrictive interpretation of the duty of reasonable care "to have the hall and stairway reasonably fit for the passage to and fro of his tenants and their visitors" excluded any duty with respect to the "safe use of the means of passage provided by him," and thus the duty of lighting the stairway unless assumed by contract with the tenant.

The general principal was given unqualified acceptance by the court of last resort in *Siggins v. McGill,* 72 *N. J. L.* 263 (*E. & A.* 1905), and reiterated in *Kargman v. Carlo,* 85 *N. J. L.* 632 (*E. & A.* 1913), where insufficient lighting of the hallway of a tenement house was held to constitute negligence, at common law and under the statute, *L.* 1904, *p.* 126, *R. S.* 55:5-15, *N. J. S. A.,* actionable at the instance

of an injured social visitor of a tenant. See, also, *Williams v. Lubbering*, 73 *N. J. L.* 317 (*Sup. Ct.* 1906) ; *McCracken v. Meyers*, 75 *N. J. L.* 935 (*E. & A.* 1908) ; *Gibeson v. Skidmore*, 99 *N. J. L.* 131 (*E. & A.* 1923) ; *Hussey v. Long Dock Railroad Co.*, 100 *N. J. L.* 380 (*E. & A.* 1924) ; *Hahner v. Bender*, 101 *N. J. L.* 102 (*E. & A.* 1925) ; *Rizzi v. Ross*, 117 *N. J. L.* 362 (*E. & A.* 1937).

Such is in substance the rule embodied in the restatement of the general common law of torts as applied in this country. *Restatement, Torts, section* 360. It is explained in *Comment* (*a*) to this section, in keeping with the essential nature of invitation, that the lessor is subject to liability "irrespective of whether the lessee or those upon the land in his right know or do not know of the dangerous condition," although contributory negligence may bar recovery. It is a standard of care laid upon the owner or occupier of land by operation of law, on grounds of social justice and policy and inherent individual right, for the protection of the users of the premises against what the *Restatement* describes as an unreasonable risk of harm to their interests of person or of property— *i. e.*, a recognizable hazard with probable injurious consequences attending a relation that for that very reason gives rise to a duty of care commensurate with the danger. This social philosophy is expressed in the common-law maxim *sic utere tuo ut alienum non laedes.*

By constitutional mandate, 1776 *Constitution, c.* XXII, 1844 *Constitution, Art.* X, *par.* 1, 1947 *Constitution, Art.* XI, *Sec.* I, *par.* 3, the common law prevails save as modified by statute; hence, this search for the basic common-law principles that even now are the subject of sharp controversy in England, as witness the recent case of *Hawkins v. Coulsdon and Purley Urban District Council*, cited *supra.* The New Jersey cases suggest judicial departure in substantial degree from the early common-law doctrine; but these deviations are now embedded in our jurisprudence by legislative acquiescence.

It remains to apply these principles to the case at hand. There can be no doubt that under our long-established

rule, the circumstances here constituted a direct invitation by the landlords to the social visitors of the tenants of this multifamilial house to use the common staircase to that end. The duty of reasonable care arises out of the relation that comes from the acceptance of the tendered use, a use in which the landlord and the tenants have a common interest. The voluntariness characteristic of mere license is lacking. The duty of care to provide reasonably safe entrance, passage and exit is of the essence of the relation. To state the circumstances is to suggest the duty as an imperative legal consequence of a use that has mutuality of interest.

Such was certainly the case as to the defendant Meghrigian. Was there a radically different and less exacting quality in the relation between plaintiff and the other tenant in common? Does it matter that plaintiff's ultimate purpose in the house was social converse and communion with the Najarians? In the use of the common stairway and approaches to reach the Najarian living quarters, and to quit the apartment house after the social visit had ended, was she the invitee of one tenant in common and the gratuitous licensee of the other, or the invitee or licensee of both? True, she was paying a social visit to the Najarians, and the common passages remained in the possession and control of the defendant owners. But this retention of control in its very nature raised the duty of reasonable care for safety in passage; and it would be a manifest perversion of principle to exclude the plaintiff user from the protection that is made the reciprocal duty of the common use for the mutual benefit of the landlords and their tenants and those acting in the right of the tenants. Reverting to the principle of *Phillips v. Library Co.*, cited *supra*, plaintiff was led by the acts and conduct of the defendant owners and occupiers to believe that the common passages were intended to be used as she had used them, and were safe for such use. Compare *Demarest v. Palisades Realty & Amusement Co.*, 101 N. J. L. 66 (*E. & A.* 1925).

Unless sustained by the reason and policy of the rule, differentiation is necessarily illusory and arbitrary; and such

is the vice of the proffered distinction. In the use of the staircase plaintiff bore an identical relation to the defendant owners in common. The reserved control of the common approaches and passages, an indispensable adjunct of a multi-unit dwelling house, raised an invitation for such use and a correlative duty of reasonable care for safety in the use; and plaintiff was not a stranger to this relation merely because her ultimate destination was the Najarian apartment for a social call. There was an implied representation of reasonable care for safety in the intended use: this for the benefit of all lawful users of the facility. Plaintiff did not become Najarian's social guest until she arrived at his dwelling and was received as such; and the social visit necessarily came to an end on her departure from the apartment. On the stairway she had, as to the owners in possession and control of the facility for the common use, the same status as the social visitors of all other tenants. The staircase was essential to the tenants' beneficial use of their premises, and thus for the mutual advantage of the landlords and tenants; and out of this relation came the common-law duty of reasonable care.

█ █ It follows from these considerations that one may be an invitee of the landlord and a mere licensee of the tenant; the landlord may be liable as such to a gratuitous licensee of the tenant, though the tenant would be under no liability; and, by the same token, the landlord who is also a dweller in a unit of a multi-family house is under the same duty of care to his own social visitors as the guests of all other tenants in their use of the common passages: for this is a common-law tort liability arising out of the reservation of possession and control of the common facilities for their mutual material welfare, a relation radically different from that obtaining in the dwelling unit itself. This would seem to be axiomatic truth, once the basic principle is taken into account. Giving due regard to the difference between invitation and mere permission, there was here an invitation implied from conduct and use. Plaintiff was not, on the occasion of the mishap, "an ordinary guest in a dwelling house,"

where the guest "for the time being becomes a member of the family of the host, entitled to the protection thrown about the household." *Comeau v. Comeau,* 285 *Mass.* 578, 189 *N. E.* 588, 92 *A. L. R.* 1002 (*Sup. Jud. Ct.* 1934). The unreason and illogic of applying the social visitor doctrine to this case is manifest.

## II.

·But it is urged that, even so, plaintiff was guilty of contributory negligence as a matter of law in that she "failed to request" Najarian to "repair the light which she knew was extinguished and yet proceeded down the stairway when admittedly she could not see where she was going and had ample opportunity to request aid," and, moreover, "she preceded her daughter who was admittedly quite familiar with the stairway and obviously younger and more spry."

 Plaintiff was under a duty to take such care for her own safety as a reasonably prudent person would have exercised under like circumstances; and this is ordinarily, because of its nature, an inquiry particularly within the province of the jury. The question is what a reasonable and prudent person would have done in the situation then confronting plaintiff. Can it be said with any show of reason that contributory fault is the only permissible inference adducible by fair-minded men? We think not.

The jury could have found from the proofs that plaintiff had relied on assurances given by Najarian that he would correct the light failure. Indeed, he testified that between 8:30 P. M. and 9:30 P. M., after plaintiff's arrival, the light was "on," although "flickering." But when plaintiff reached the second floor on her way down, the only means of exit, she was met with darkness. What was she to do in the unexpected dilemma? Can it reasonably be said that in the course taken in her unforeseen predicament, there was such error of judgment as to render her guilty of negligence, clear and indubitable? Should she have turned and ascended the dark stairs, or have cried out in alarm? Did she appreciate

the risk of descent in the circumstances, or would a reasonable person have realized the danger? To put these queries is to show the essential factual nature of the inquiry. On his own admission, Najarian neglected to replace a flickering and dying light that failed completely sooner than he expected; and now we are asked to characterize as negligence plaintiff's behavior in the face of the resulting emergency, judged by reasoned hindsight. The law's burden is not so heavy, nor so unrealistic. The case is not unlike *Kargman v. Carlo*, cited *supra*, where Mr. Justice Trenchard ruled that the issue was one for the experienced judgment of the triers of the facts.

Primary negligence is conduct which gives rise to an undue risk of harm to others; contributory negligence is conduct which involves an undue risk of harm to the person injured. The test is objective and not subjective. In the one case the reasonable man is a person who pays reasonable regard to the safety of others; in the other, the reasonable man is a reasonably prudent man who is reasonably regardful for his own safety. *Restatement, Torts, sections* 463, 464. The assessment of conduct is ordinarily a factual function; only in the clearest case of fault, where the contrary hypothesis is not fairly admissible, does the question become one of law for appropriate action by the court. And, as said by Somervell, L. J., in *Hawkins v. Coulsdon and Purley Urban District Council*, cited *supra*, there is the danger of endowing the reasonably careful man with attributes which properly belong to a person of exceptional perspicuity and foresight.

The judgment is reversed, and a new trial is awarded.

BURLING, J. (dissenting). Assuming the duty owing by the defendants to the plaintiff as defined in the majority opinion, the motion of the defendants at the conclusion of the reception of evidence for judgment in their favor upon the ground of contributory negligence should have been granted.

The test of contributory negligence is whether the action of the plaintiff is such as to constitute a failure to use such

care for his safety as the ordinarily prudent man in similar circumstances would use.

When the reception of evidence was concluded the lack of adequate illumination was the sole and remaining allegation of actionable negligence. The plaintiff incurred the risk of danger of the very thing which is the foundation of recovery. The deficiency of operation of the light upon the second floor was called to the attention of the defendant Najarian in his apartment by the daughter of the plaintiff in her mother's presence. Upon conclusion of the mission, she proceeded to descend from the third floor to the second floor. The plaintiff had the opportunity and duty to ascertain whether replacement of the light had been made before initiating her descent especially since she was accompanied to the stairs at the third floor by the defendant Najarian. Aware of the continued deficiency in operation of the light upon the second floor and in the face of darkness at this point she continued to descend. The plaintiff clearly disregarded the obvious dangerous condition. *Cf. Nauman v. Central & Lafayette Realty Co., Inc.*, 137 *N. J. L.* 428, 430 (*Sup. Ct.* 1948), affirmed *per curiam* in 1 *N. J.* 124 (1948).

Even though the stair well was the only means of exit there was no immediate necessity for her to proceed with the premises in that condition. *Cf. Saunders v. Smith Realty Co.*, 84 *N. J. L.* 276, 280 (*E. & A.* 1913). Darkness, the alleged result of breach of duty of the defendants constituted the sole allegation of proximate cause of injury. By heedlessly proceeding in the face of danger this clear case of fault invited the injurious consequence. *Volenti non fit injuria.*

Where in the trial of an action there are no disputed facts or disputed inferences to be drawn from the undisputed facts, it devolves upon the court to declare the judgment which the law imposes. Where, as here, the negligence of the plaintiff clearly and conclusively appears and proximately contributed to the plaintiff's injury there is no warrant for the submission of that question to the jury for its determination and judgment for the defendant should be entered.

For the reasons expressed herein I would affirm the judgment of the Superior Court, Appellate Division.

Chief Justice VANDERBILT and Justice OLIPHANT authorize me to state that they concur in the views expressed herein.

*For reversal*—Justices HEHER, WACHENFELD, JACOBS and BRENNAN—4.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT and BURLING—3.