70 N.J. Super. 275 (1961)
175 A.2d 455
CHESTER B. HARDMAN, PLAINTIFF-RESPONDENT,
v.
FORD MOTOR COMPANY, ETC., AND BATON CONSTRUCTION COMPANY, ETC., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 25, 1961.
Decided November 16, 1961.
*279 Before Judges CONFORD, FREUND and LABRECQUE.
Mr. Samuel P. Orlando argued the cause for defendant-appellant, Ford Motor Company, etc. (Mr. Aaron Dines, on the brief).
Mr. Peter J. Devine, Jr., argued the cause for defendant-appellant, Baton Construction Company, etc. (Messrs. Kisselman, Devine, Deighan and Montano, attorneys; Mr. Devine, of counsel; Mr. Michael Patrick King, on the brief).
Mr. Michael J. Piarulli appeared for third-party defendants-appellants, William E. Snell, Inc., etc., et als.
Mr. Charles A. Cohen argued the cause for plaintiff-respondent (Messrs. Plone, Tomar, Parks and Seliger, attorneys; Mr. William Tomar, of counsel; Mr. Cohen, on the brief).
The opinion of the court was delivered by FREUND, J.A.D.
Plaintiff, an employee of an electrical contractor on a construction project, was injured when a ladder he was climbing to get access to a loft slipped and fell to the floor. This is an appeal from a judgment in favor of the plaintiff, following a jury verdict of $55,000 for personal injuries, against Ford Motor Company (Ford), the owner of the premises, and Baton Construction Company (Baton), the general contractor. Plaintiff's employer, William E. Snell, Inc., and/or William E. Snell and Mae Snell, t/a William E. Snell Company (Snell), was made a third-party defendant by defendant Baton. It appeals from the jury's special verdict finding it negligent.
Plaintiff filed his complaint against Ford and Baton and also a claim against the third-party defendants, Charles *280 Riley, t/a Charlie's Window Cleaning Service (Riley), an independent contractor, and C.J. McGonigal Plumbing, Heating & Industrial Piping Contractor, Inc. (McGonigal), a subcontractor, in which he asserted their negligence. Ford cross-claimed against Baton on an indemnification agreement, and filed a third-party complaint against Riley for indemnification and contribution. Baton filed a third-party complaint against McGonigal for indemnification and contribution and, as noted above, against Snell for indemnification. The trial judge directed the entry of a judgment of dismissal with prejudice of Baton's third-party complaint against McGonigal at the end of the trial. A similar judgment was entered on plaintiff's claim against Riley when Hardman conceded he could not prove him negligent. Questions of indemnity as to the other defendants were reserved for subsequent disposition and are not involved on this appeal.
In August of 1956 Ford began the construction of its Delaware Valley Parts Depot on Route 130 in the Township of Pennsauken, N.J. Ford independently contracted for the structural steel and its erection directly with Samuel A. Lindstrom Co., but engaged Baton as general contractor for the remainder of the construction. Baton subcontracted much of the work, retaining only the finishing work and the carpentry work. Among its subcontractors were Snell, who performed the electrical work; McGonigal, who installed the air conditioning equipment; and Baton Structure and Foundation Co., an affiliate of defendant Baton, who did the concrete work, including the foundations, footings and general floor slab.
By the summer of 1957 the plant was in its final stages of construction. In the latter part of August Ford, with Baton's permission, entered into possession of a nearly completed room designated as the cafeteria. Desks and chairs had been unpacked there for the use of Ford employees charged with keeping records of material received at the plant. Cafeteria tables and chairs were installed for the convenience of employees of Ford and the contractors who *281 wished to use the area for eating purposes. Food vending machines were also installed. After Ford moved into the cafeteria, its maintenance force was assigned to cleaning the floor, the tables and chairs.
The cafeteria was approximately 12 feet high from the floor to an acoustical, false or hung ceiling. There was an additional 8 feet of space above the ceiling under the roof. McGonigal had installed, in this space, on a platform adjacent to the eastern wall, a commercial size air conditioning unit, 5 feet high and 7 or 8 feet long. There was a light near the unit sufficient to enable the making of adjustments on the controls. Access to the space above the ceiling was provided by a permanent iron ladder fixed to the western wall of the cafeteria, but the only approach to the air conditioning unit from the top of that ladder was by balancing oneself and walking across the ceiling over the "I" beams. During the period in question, more convenient access to the unit was provided by a temporary ladder which reached from the floor of the cafeteria through a temporary opening or scuttle hole in the ceiling. It was possible to step directly from this ladder onto the air conditioner platform. The ladder was in position for several months and had been used by other workmen, as well as by the electricians who worked on the air conditioner.
The ladder, described as makeshift, was constructed of wood 2 x 4s as rails, with 1 x 3 rungs that were nailed on to the rails. It was not the type of finished product sold in a hardware store, but was tailor-made on the site to suit a particular need. There is no dispute that the ladder itself was safe, strong and of good workmanship. There were, however, no rubber shoes on the bottom of the rails.
There is no direct evidence to indicate who built the ladder. Testimony, especially that of Paul J. Kelly, business manager of Local Union 439, International Brotherhood of Electrical Workers, and an officer of the Camden County Building Trades, pointed to Baton as a possible source. When shown a picture of the ladder, Kelly stated that carpenters of the *282 general contractor (Baton) would normally construct and furnish a ladder of that type. He added that the custom of the trade was for the general contractor to provide access, by use of a ladder, from one level to another and that the cafeteria, because it had a false ceiling, was a two-level room. He further testified that the fabrication of a ladder for use on a job would normally be by carpenters and that on this particular job the carpenters were supplied by the general contractor. He pointed out that union conditions and the normal distribution of labor among building trades prevailed during the construction of this job. This testimony was contradicted by Ralph Hanson, a carpenter foreman employed by Baton, who stated that employees of other subcontractors who were members of the carpenters' union could build the ladder in question without violating union practices or regulations.
William Scarle, Snell's foreman for five years, also testified that only carpenters would construct a ladder of the kind used in the cafeteria. He corroborated the testimony of Kelly that it was the custom for the general contractor to provide access for various tradesmen who are required to work on different levels in a building. But he disagreed that a room with a false ceiling has two levels. He did not expect, nor did he request, the general contractor to provide a ladder for installation of the electrical work. It is implied in Scarle's testimony that in laying the wiring and power lines in the cafeteria, the electricians used their own ladders.
John S. Keough, a superintendent for Baton, stated he never expected, nor was he called upon by any subcontractor, to furnish a ladder for work in the lunchroom. Thomas R. Null, Jr., who succeeded Keough as superintendent, denied Baton had built the ladder. He did testify, however, that he saw the ladder in the cafeteria for three months. Hanson, the Baton foreman who had 20 to 25 carpenters working for him on this job, stated he never ordered the construction of the type of ladder used in the lunchroom. He conceded *283 seeing a ladder in the cafeteria but could not describe its appearance. He also conceded that on a construction job where there are more than one subcontractor, it is the custom for the general contractor to provide access to different levels. None of the other witnesses knew who provided the ladder and all possible suspects denied they had manufactured it.
The floor of the cafeteria was concrete slab, covered with vinyl asbestos tile that had been laid and waxed by Johns-Manville, the flooring contractor, shortly before Ford moved into the room. Ford hired Riley soon thereafter to "clean tile and take out all scratches and black marks with steel wool" and with "one coat of wax * * * buff with machine to a high lustre." Riley performed the work on September 15 and 16. After the floor was scrubbed, he applied a hard forming wax, and with a machine "buffed to a high lustre." Riley described the waxed floor as having a sheen and added that, "It had to be slippery because it had wax on it." He also recalled waxing around a large object in the area below the crawl space but could not remember if that object was a ladder or a vending machine. When Riley had completed his work, Ford employees inspected the job. The bill for the work was received in evidence and is signed by a Ford employee indicating that the work was completed and satisfactory.
On September 18, Snell had only to remove some temporary lines, replace some cover plates, prepare a directory of the lighting panels and make some final adjustments on the air conditioner. Hardman, an electrician and a subforeman for Snell who had been working at the plant for five months, entered the crowded cafeteria to adjust the malfunction of a solenoid valve in the air conditioner. He used the ladder in question to climb up through the scuttle hole. He testified, "I looked at the ladder and got a hold of the ladder and it was rigid" and "I got a hold of the ladder, it was solid." When he reached the level of the false ceiling, the ladder slipped and he fell to the floor, sustaining serious *284 injuries. The next day, Ford's maintenance force destroyed the ladder.
Hardman had climbed the ladder on several previous occasions, the most recent being two weeks before the accident. He acknowledged that the safe practice is to tie the ladder at the top to make it secure. Kelly testified to the same effect but Scarle said it was not a custom of the trade. Plaintiff had no recollection of seeing whether the ladder had been tied-off when he previously used it. Hardman had not been warned, nor did he notice that the floor was recently waxed. On the day of the accident, the floor was described as "glossy," "shiny," "100% polished" and that it had a "very high lustre."
The basis of Hardman's case against Ford was that the landowner, despite its knowledge or notice of the presence of the ladder and of the use to which it was being put, caused the floor to be waxed and polished, knowing, or being chargeable with knowing, that this treatment rendered the floor slippery and that the ladder might thus slide when used. As for Baton, plaintiff contended that the general contractor constructed and provided the ladder to be used by, among others, subcontractors' workmen who would have occasion to go to the space above the false ceiling. He claimed the ladder was improperly constructed and defective, and was not secured at its top from slipping. We proceed to separately consider the plaintiff's case against each defendant.

LIABILITY AS TO FORD.
Ford's principal argument is that since there was no evidence of negligence on the part of Riley, its independent contractor, it must follow there was no negligence on its part. In the alternative, it is argued that since Riley was discharged from liability without objection by the plaintiff, there could be no basis for the imputation of liability to Ford and, therefore, it also must be absolved. The argument, thus, is that Ford could only be liable derivatively.
*285 The plaintiff counters that the action against Ford does not involve imputed or secondary liability, nor does it involve another's negligence. Ordinarily, no action will lie against a principal for vicarious liability when his agent has been exonerated. Kelley v. Curtiss, 16 N.J. 265, 270 (1954); Restatement, Judgments, § 99, p. 493. But vicarious liability is not the basis of the action against Ford. Rather, Ford's liability was based on its having the floor waxed and polished at a time when, it is alleged, it was foreseeable that such an act could lead to injuring those who would use the ladder. The test of liability is whether, under the particular circumstances, the injury ought reasonably to have been anticipated. Bohn v. Hudson & Manhattan R. Co., 16 N.J. 180, 184-5 (1954); McKinley v. Slenderella Systems of Camden, N.J., Inc., 63 N.J. Super. 571, 583 (App. Div. 1960). The reasonably prudent person may fairly be charged with knowledge that an unsecure ladder resting on a slippery floor involves a foreseeable risk of harm to one who climbs it. Cf. McCabe v. N.J. Turnpike Authority, 35 N.J. 26, 35 (1961). The evidence was sufficient to support a jury finding that Ford was negligent in causing the tile floor to be waxed and buffed to a high lustre under the circumstances here present without warning or notifying those who would use the ladder. Berger v. Shapiro, 30 N.J. 89, 100 (1959); Mistretta v. Alessi, 45 N.J. Super. 176, 182 (App. Div. 1957).
It is established that the owner of land who invites workmen to come upon his premises is under a duty to exercise ordinary care to render reasonably safe the areas in which he might reasonably expect them to be working. Taneian v. Meghrigian, 15 N.J. 267, 273-4 (1954); Gudnestad v. Seaboard Coal Dock Co., 15 N.J. 210, 219 (1954); Reiter v. Max Marx Color & Chemical Co., 67 N.J. Super. 410, 413 (App. Div. 1960), affirmed 35 N.J. 37 (1961); Ginnelly v. Continental Paper Co., 57 N.J. Super. 480, 489 (App. Div. 1959), certif. denied 31 N.J. 293 (1960); Murphy v. The Core Joint Concrete Pipe Co., 110 *286 N.J.L. 83, 86 (E. & A. 1933); 2 Harper & James, The Law of Torts, § 27.12, p. 1481 (1956); Restatement, Torts, § 344, p. 945. There was sufficient evidence relating to the extent of the slipperiness of the tile floor on the day the ladder fell to raise a factual issue for the jury's determination as to whether Ford had carried out its duty of ordinary care. It was for the jury to determine from the evidence whether Ford should have given notice or warning to those who might use the ladder that it could slip, notwithstanding the practice of tying ladders at the top and the lack of evidence that Ford had no knowledge that the ladder was not so tied. The entire issue of foreseeability of harm was properly submitted for decision as an issue of fact rather than one of law under the circumstances of this case. Bacak v. Hogya, 4 N.J. 417, 424 (1950); Glaser v. Hackensack Water Co., 49 N.J. Super. 591, 596 (App. Div. 1958); De Mott v. Knowlton, 100 N.J.L. 296, 299 (E. & A. 1924). See Prosser on Torts, § 49, pp. 268-9 (2d ed. 1955).
The next argument by Ford is that liability is to be denied where it appears that the nature of a condition is known to the plaintiff or could be observed by a reasonable use of the faculties, relying upon Wolczak v. National Electric Products Corp., 66 N.J. Super. 64, 75-6 (App. Div. 1961 and Pearlstein v. Leeds, 52 N.J. Super. 450, 459 (App. Div. 1958), certif. denied 29 N.J. 354 (1959).
We must here distinguish between the concept of negation of duty because of occasional risk inherent in the plaintiff's work, see Meistrich v. Casino Arena Attractions, Inc., 31 N.J. 44, 48-50 (1959), and the case where defendant owes the duty but plaintiff forfeits his right by reason of his contributory negligence. The Wolczak case, supra, illustrates the former principle. The Pearlstein case, supra, is analogous in the area of landowner's liability to persons lawfully on the premises. That principle, however, is clearly not applicable here. The risk of this kind of accident was not inherent in the plaintiff's work so as to negate the duty of the owner of the property.
*287 As to the matter of contributory negligence proper, this was for the jury. There is an absence of testimony from which Hardman could be said positively to have had knowledge that the floor had been recently waxed and polished. Nor is there any evidence that would tend to show that the waxed and buffed floor was so clearly noticeable that plaintiff should be held, as a matter of law, to have observed it. Hardman testified that he did take hold of the ladder and that it seemed solid and rigid and to be adequate for its intended use. From this the jury could have concluded that Hardman did not appreciate the extent of the danger, either in respect to the probability that the ladder was not tied off, or that the slippery condition might make it more likely to fall than otherwise. There was no error in submitting the question of plaintiff's contributory negligence to the jury. Battaglia v. Norton, 16 N.J. 171, 179 (1954); Gudnestad v. Seaboard Coal Dock Co., supra (15 N.J. 210, 222).
Several objections are raised by Ford with respect to the charge to the jury and the refusal to charge as requested. The jury was instructed that plaintiff's theory was that Ford was negligent in the manner or at the time it applied wax to the floor thus creating a hazard which was the proximate cause of the resultant fall. No objection was made by counsel to this portion of the charge. Failure to object ordinarily precludes a party from questioning the propriety of the instruction on appeal. Lertch v. McLean, 18 N.J. 68, 74 (1955); R.R. 4:52-1. The claim is now made that the use of the word "hazard," without further defining it, was patently erroneous since the record does not support any contention of hazard. However, it is clear the judge did not employ the word "hazard" as a word of art. We see no error in this regard since the charge was simply paraphrasing the obvious contention of the plaintiff that an unsafe condition had been created in waxing the floor to a condition of slipperiness in relation to the position and potential use of the ladder.
*288 The remaining contentions in respect to the charge are likewise of no merit. Complaint is made of that portion of the charge that defines the duty of a landowner. The judge stated:
"The law provides that an employee of a subcontractor who enters upon the premises of the owner of the said premises in pursuance for his work for his employer is an invitee and the owner owes him a duty to use reasonable care to render the premises reasonably safe for the purposes embraced in the invitation."
The rule of law was substantially correctly stated. It is clear, as we have already noted, that Ford owed the duty to the workmen upon its premises, including the plaintiff, as its invitees, to use ordinary care to render reasonably safe the area where they were to work. Taneian v. Meghrigian, supra (15 N.J. 273-4); Reiter v. Max Marx Color & Chemical Co., supra (67 N.J. Super., at p. 413).
Ford alleges error in the refusal to deliver a requested charge that it was "not necessary for the defendant to offer testimony of the plaintiff's failure to exercise reasonable care." This was not error in the context of the proofs as a whole. The court charged the appropriate rules of contributory negligence and proximate cause. Furthermore, the cross-examination of plaintiff, on behalf of Ford and Baton, was for the obvious purpose of indicating that Hardman could have been himself negligent in not discovering whether the ladder was safe for his use. Thus, there is every reason to suppose that the jury passed upon the issue of contributory negligence, as it must have, and did not deem itself precluded from finding that there was contributory negligence by mere reason of Ford's failure to offer affirmative proof on the point.
It is also claimed that a request to charge the jury should have been given on its function and duty regarding expert testimony. However, it is not shown that the failure to do so prejudiced the defendant in any particular.
The final point raised by Ford is that it was materially harmed by the exclusion of evidence of precautions contractually *289 imposed by it upon Baton. The denial of this motion was proper. By contract, the general contractor (Baton) had undertaken to use certain safety measures during the construction. The offer of these contract provisions for the probable purpose of shifting to Baton Ford's liability for its own negligent acts or omissions might well have confused the jury. Ford could not escape liability to the plaintiff for its own negligence by the contractual delegation of its duty to a general contractor. Majestic Realty Associates, Inc. v. Toti Contracting Co., 30 N.J. 425, 439, affirming 54 N.J. Super. 419 (App. Div. 1959); Newman v. Pasternack, 103 N.J.L. 434, 438 (E. & A. 1927); Sebeck v. Plattdeutsche Volkfest Verein, 64 N.J.L. 624, 625 (E. & A. 1900); 2 Restatement, Torts, § 410, p. 1102.

LIABILITY AS TO BATON.
It is contended by Baton that the trial judge erred in refusing to grant its motion for judgment of involuntary dismissal or for a judgment notwithstanding the verdict, since the only proof tending to show that Baton actually furnished and had a duty to furnish the ladder consisted of loosely formulated and highly disputed evidence of the custom and use of the trade which should have been excluded. The building trade customs, testified to by several witnesses, are that the general contractor is required to furnish means of access from one level to another, that the wooden makeshift ladder, from which plaintiff fell, was usually constructed by carpenters and that it was a standard safety procedure (denied only by Scarle) to fasten or tie-off the top of a ladder so as to make it secure.
The introduction of proof of custom or habit seems to be conditioned upon a showing of corroborating circumstances indicating that the custom had been followed in the particular instance. Notkin v. Brookdale Gardens, 28 N.J. Super. 9, 15 (App. Div. 1953); Cook v. Phillips, 109 N.J.L. 371, 373 (E. & A. 1932). Appellant urges that since no such corroborative testimony was forthcoming, evidence of *290 custom should have been excluded, and since the remaining evidence showed only a possibility that Baton furnished the ladder, judgment should have been entered for Baton as a matter of law. This contention is not supported by the record.
There was evidence that the ladder was of good workmanship and supplied for the purpose of providing access to the scuttle hole. This would tend to indicate that it was made by carpenters. Baton had specifically reserved the carpentry work for itself. According to Kelley's testimony, union conditions and the ordinary division of labor required the general contractor to provide the ladder. Although there was no direct proof that the general contractor built the ladder, neither was there proof that anyone else had built it. While Baton's superintendents and carpentry foreman denied their workmen had built the ladder, there was an inferable probability that a Baton employee built it without seeking permission. It was a simple piece of work. There was credible testimony that the false ceiling divided the room into two levels with the resultant inferable duty upon the general contractor to provide access to it. In sum, there was sufficient corroborative evidence to permit the jury to determine the question of whether Baton had supplied the ladder and failed to tie it off. If the determination was in the affirmative the jury could have found that there was a breach of the general contractor's duty to use reasonable care to see that the place in which work was to be performed by an employee of a subcontractor was reasonably safe. Meny v. Carlson, 6 N.J. 82, 95 (1950). Consequently, it was not error to receive evidence of the customs of the trade.
On Baton's motion for involuntary dismissal, the court was required to accept as true all the evidence that supported the position of the party against whom the motion was made, and to give him the benefit of all the inferences in his favor that might logically and legitimately be drawn therefrom. Long v. Landy, 35 N.J. 44, 53-4 (1961); O'Donnell v. Asplundh Tree Expert Co., 13 N.J. 319, 328 (1953).
*291 It is also urged by Baton that the trial court was in error in admitting the provisions of R.S. 34:5-93 and 34:5-95 into evidence and in charging the jury that a violation of the construction industry safety code could be considered as some evidence of Baton's negligence, if the jury found Baton had a duty to supply the ladder, did supply it and that the ladder was in Baton's charge at the time it was in use. R.S. 34:5-93 provides that "ladders shall be provided to give access to all floors, stagings or platforms where work is being done more than five feet above * * * a permanent or temporary floor." Ladders, under R.S. 34:5-95, must be "set up in a manner to be secure and to prevent slipping * * * [and] shall be securely fastened to a permanent support at top, and if necessary, at the bottom also, * * *." The duty to furnish these safeguards is placed upon "[a]ny manager, superintendent, owner, foreman or other person in charge of any * * * construction * * *." R.S. 34:5-161 (Emphasis added.)
Baton denies there was evidence that tended to show it was in charge of the place where the accident occurred and relies upon the authority of Trecartin v. Mahony-Troast Construction Co., 18 N.J. Super. 380 (App. Div. 1952), affirmed 21 N.J. 1 (1956). There the general contractor was not the "person in charge" of the building, construction or the area where the accident occurred. Baton theorizes that it was more reasonable to conclude that Snell, rather than itself, was chargeable with violating the safety code. These arguments ignore the conditions subject to which the statutes were permitted to be considered. The jury was instructed not to consider the statutory provisions unless it first found from the evidence that it was the duty and obligation of Baton to supply the ladder, and that it did supply and was in charge of the ladder at the time of its use. Nor is there any implicit requirement in R.S. 34:5-161, as applied to the present facts, that the general contractor had to be in actual charge of the work being done above the false ceiling to be charged with the duty of complying with the rules of *292 safety in respect to ladders. If the jury found it was the general contractor's responsibility to provide the ladder, upon the safety of which every workman using it must be deemed to have relied, and that it did in fact furnish the ladder, then, under these circumstances, Baton became subject to the standard of care mentioned in the statute. Since there was ample credible testimony from which the jury could find that Baton had supplied the ladder but had not fastened it in accordance with the safety code, the violation of the code could properly have been submitted to the jury for its determination as an incident of negligence.

THE APPEAL BY SNELL.
Snell purports to appeal from the jury's special verdict finding it negligent. However, the record contains no judgment or order entered on that verdict, interlocutory or otherwise. Moreover, at oral argument, Snell took the position that even if we were to consider the appeal and affirm the determination of its negligence, it would not concede liability to Baton on the basis thereof, but would contest its liability when the reserved issues are taken up again before the trial court. In other words, our entertainment of the Snell appeal could not eventuate in a final disposition of its liability. Under these circumstances, it is clear that there is no judgment or order entered in the trial court from which Snell's appeal can or should be considered. From the record, it is clear that no one at the trial level regarded the present proceeding thus far as encompassing any judgment or order in favor of Baton against Snell, much less any final judgment from which an order might be taken without application to the Appellate Division for leave to appeal pursuant to R.R. 2:2-3(a). Therefore, the purported appeal by Snell is dismissed.
The judgment against Ford and Baton is affirmed.