SADIE T. LaFREDA AND JOHN LaFREDA, PLAINTIFFS-APPELLANTS, v. HOWARD REID WOODWARD AND CARL RAYMOND WOODWARD, EXECUTORS OF THE LAST WILL AND TESTAMENT OF WILLIAM H. WOODWARD, DECEASED, AND HOWARD REID WOODWARD, CARL RAYMOND WOODWARD AND WILLIAM STANLEY WOODWARD, DEFENDANTS-RESPONDENTS.

Argued May 22, 1940—Decided October 10, 1940.

For the appellants, *Parsons, Labrecque & Borden* (*Theodore D. Parsons,* of counsel).

For the respondents, *Kalisch & Kalisch* (*Isidor Kalisch,* of counsel).

The opinion of the court was delivered by

HEHER, J.   The appeal is from a judgment of nonsuit in an action *ex delicto* for negligence against a landlord arising from a fall upon the demised premises suffered by an invitee of the tenant.

These are the material facts and circumstances: On December 4th, 1935, the landowner, William H. Woodward, leased to Dr. Maurice A. Aaronson, a practicing physician, the two-story dwelling house known as No. 12 Washington street, in

the city of Long Branch. A draft of lease prepared in accord-
ance with the landowner's instructions, but not actually exe-
cuted, fixed the term at one year, and provided that the leased
premises were "to be used professionally" by the lessee "in
his practice as a doctor of medicine;" and, while the real
estate broker, who negotiated the tenancy contract as the
landowner's agent, testified that he informed his principal
that the prospective tenant "wanted to rent the premises as
a Medical Center," he acknowledged that the unexecuted
instrument fully embodied "the terms of the agreement of
lease" and "the purposes for which the property was to be
used." The lessee devoted the first floor of the premises to the
practice of his profession (he sublet the second floor); and,
on March 17th, 1937, while the tenancy still subsisted on the
original terms, the plaintiff, Sadie T. LaFreda, a patient
of the lessee, fell on a footway extending from the front porch
of the building a distance of twelve feet to the public sidewalk,
as she was departing from the premises after having received
medical treatment, and sustained injury. This pathway was
within the leased premises. It was three feet wide, and con-
structed of concrete; and the contention was that "the heel
of" this plaintiff's "right foot caught in one of the crevices
of" the walk.

There was evidence tending to show that the concrete
surface was in a state of disrepair, due to wear and tear and
the ravages of the elements, and that it was not of "ordinary"
and "proper thickness," and was constructed of substance
not of "a proper mixture;" and the specifications of negli-
gence, variously stated, were (a) the landlord's failure to
"maintain" the footway "in a safe and proper condition,"
and to keep it "in good repair," and to "prevent" it "from
becoming a nuisance or dangerous and hazardous to the life
and limb of those lawfully using" it; (b) its construction
"with structural defects," in that there was "no proper base
or foundation," and there were "insufficient cement and
improper drainage," and so a nuisance, and the leasing of the
premises in that condition, the landowner knowing that the
lessee "intended to use" them "for public or semi-public pur-
poses;" and (c) carelessness in the making of repairs.

It is conceded that there was an utter lack of evidence to sustain specification (c). The contract did not impose upon the landlord the duty of making repairs during the subsistence of the tenancy; and he did not, gratuitously or otherwise, undertake the making of repairs to the demised premises prior to the mishap made the subject of this action.

Nor was there a structural defect in the legal view. It was a condition of disrepair merely. While it is probable that a heavier surface would have been more durable, this is not *per se* a determinative consideration as regards faulty construction. So far as is revealed by the evidence, the condition dangerous to life and limb was not the result of improper construction, but rather the breakdown of the pavement through the wastage of time and use.

The initial insistence of appellants is that, "where a landlord leases a building for a public or semi-public use, the public is deemed to be invited to make such use thereof by the owner, and the latter cannot evade responsibility of exercising due care to make it reasonably safe by demising it to a tenant."

More specifically, it is said that, in thus leasing the premises, the landowner "acted with knowledge that the premises were rented for the explicit purpose of professional offices," and that "the premises were to be used by patients and those of necessity accompanying the patients to a doctor's office," and therefore the "premises were by this lease devoted to a public office," and the landowner is liable for injuries resulting from the existent "dangerous condition" to those "who rightfully came thereon pursuant to the use to which the premises were to be devoted"—citing *Eckman* v. *Atlantic Lodge,* 68 *N. J. L.* 10; *Smith* v. *Delaware River Amusement Co.,* 76 *Id.* 461; *Johnson* v. *Zemel,* 109 *Id.* 197; *Martin* v. *Asbury Park,* 111 *Id.* 364.

But the principle of these cases is not applicable here. It is the established general rule in this state that, upon the letting of a house or lands, there is no implied warranty or condition that the premises are fit and suitable for the purpose specified, or for the use to which the lessee proposes to devote them, or indeed for any purpose; and the landlord is

therefore under no liability for injuries sustained by the tenant, or his family, by reason of the ruinous condition of the demised premises, unless there has been fraudulent concealment of a latent defect. The doctrine of covenants implied from the letting "has been held in great strictness in this state." The rule of *caveat emptor* governs generally. And it is likewise the rule, also grounded in the common law, that a landlord is under no greater duty to persons who come upon the leased lands, by invitation of the tenant, than he is to the tenant himself. Such usually enter the premises under the same title as the lessee, and not at the invitation of the landlord, express or implied, and are therefore so identified with the tenant as ordinarily to have no greater rights against the landlord as respects injuries sustained therein than has the tenant. *Naumberg* v. *Young,* 44 *N. J. L.* 331, 344; *Mullen* v. *Rainear,* 45 *Id.* 520; *Clyne* v. *Helmes,* 61 *Id.* 358; *Siggins* v. *McGill,* 72 *Id.* 263; *Reilly* v. *Feldman,* 103 *Id.* 517. See, also, *Cowen* v. *Sunderland,* 145 *Mass.* 363; 14 *N. E. Rep.* 117; *Baum* v. *Ahlborn,* 210 *Mass.* 336; 96 *N. E. Rep.* 671; *Fraser* v. *Kruger,* 298 *Fed. Rep.* 693; *Huggett* v. *Miers,* 2 *K. B.* (1908) 278; 1 *B. R. C.* 97; 77 *L. J. K. B.* (*N. S.*) 710; 99 *L. R.* (*N. S.*) 326; 24 *Times L. R.* 582.

The *ratio decidendi* of *Eckman* v. *Atlantic Lodge, supra,* is that the owner of a building "constructed for public purposes holds out to the public by letting it for such purposes, that it is safe; and further, that the owner is bound to use reasonable care to see that it has been properly constructed and is maintained in a fit condition for the purposes for which it is used, and that he is responsible for injuries resulting from his failure in that regard which are received by persons who are present on public occasions, whether as spectators or as employes." To the same effect is the case of *Johnson* v. *Zemel, supra.* And in *Martin* v. *Asbury Park, supra,* this court considered the exception—one more apparent than real when its rationale is considered—as limited to those cases in which the premises were "designed for use by the public for public purposes and use by large numbers of persons." See, also, *Mead* v. *Baum,* 76 *N. J. L.* 337.

While these cases have reference to buildings "designed" or "constructed" for "public or semi-public use," there would seem to be no reason in principle why buildings "devoted" to such purposes by stipulation of the parties should have an essentially different classification, for the basis of the direct liability imposed upon the landlord is that, by the nature of the use, he is deemed to have extended an invitation to the public to make such use thereof, and so is under a duty to exercise reasonable care for the safety of those who shall respond to the invitation. Compare *Phillips* v. *Library Co.*, 55 *N. J. L.* 307; *Clyne* v. *Helmes, supra*. Therein lies the limitation of the principle.

It remains to consider what constitutes a "public" or "semi-public use" within the intendment of this doctrine. Here, the building was primarily a dwelling, designed for service as such; and, if its use also as a medical practitioner's "office" *ipso facto* gave it the character of a building devoted to a "public" or "semi-public" purpose, so also would all other buildings wherein the dweller transacts business, however small and insignificant, fall into that category. Where, then, is the line of demarcation? It is implicit in the cases cited by appellants that the use shall entail the admission of "a large number of persons" as patrons of the lessee. Indeed, such was the pronouncement of Chancellor Campbell for this court in *Martin* v. *Asbury Park, supra*. And in *Eckman* v. *Atlantic Lodge, supra*, Chief Justice Gummere speaks of the landlord's obligation to persons "present on *public occasions*, whether as spectators or as employes." And this is likewise in substance the criterion of the rule embodied in the recent restatement of the general common law of torts as applied in this country, whereby there is laid upon a landowner who leases his land "for a purpose which involves the admission of a large number of persons as patrons of his lessee" liability for bodily harm suffered by such patrons by reason of "an artificial condition existing when the lessee took possession, if the lessor (a) knew or should have known of the condition and realized or should have realized the unreasonable risk to" such persons "involved therein, and (b) had reason to expect that the lessee would admit his patrons before the land was

put in reasonably safe condition for their reception." 2
*A. L. I. Torts,* § 359.

While it has been said, in criticism of this rule, that there
is no real "distinction in law depending merely upon the
number of persons who enter upon the premises," and that
"an attempt to distinguish situations based solely upon the
number of persons who visit premises as patrons of the tenant
would make liability depend upon a test unsatisfactory and
impractical to apply" (*Webel* v. *Yale University,* 125 *Conn.*
515; 7 *Atl. Rep.* (2d) 215), it would seem to supply a suf-
ficiently certain and definite standard, unless any professional
or business activity on the premises, or use involving contact
with outsiders, is to constitute the touchstone. The adjective
"large" denotes qualification inconsistent with the latter
usage—one that would be plainly inappropriate if the rule
were to have such sweep. The use is not to be denominated
"public" or "semi-public," within the significance of the rule,
merely because it contemplates the admission of a "number"
of persons as patrons of the lessee. To warrant that category,
it is essential that the number be "large"—in the sense of
great as opposed to small. If the premises are adapted to a
use that elicits the patronage of a large number of persons,
the use is sufficiently public in character to invest the tenant's
patrons with the status of persons entering the premises upon
the invitation of the landlord, and thus to charge the latter
with the duty of care arising out of such relationship. Only
in such circumstances does the law deem it politic to impose
upon the landlord a duty to the tenant's invitees wholly apart
from that bottomed in the tenancy contract. Even though the
definition is devoid of the absolute quality that would auto-
matically resolve every case, it is yet a fairly practical classi-
fication of public and private uses in that behalf.

A broader rule would run counter to the long-established
policy of this state; and the enlargement of that policy is
not a judicial function. If its extension is to be justified, as
in *Webel* v. *Yale University, supra,* on the ground that "the
basis of liability  *  *  *  is that the landlord leases prem-
ises on which he knows or should know that there are condi-
tions likely to cause injury to persons entering upon them,

that the purpose for which the premises are leased involves the fact that people will be invited upon the premises as patrons of the tenant, and that the landowner knows or should know that the tenant cannot reasonably be expected to remedy or guard against injury from the defect," or, as in *Nugent* v. *Boston, C. and M. R. Corp.*, 80 *Me.* 62; 12 *Atl. Rep.* 797, and *Colorado Mtg. and I. Co.* v. *Giacomini*, 55 *Col.* 540; 136 *Pac. Rep.* 1039; 54 *L. R. A.* (*N. S.*) 364, for the reason that, by the "letting for profit" of lands unsafe for the "avowed purpose for which they are let," the landowner "authorizes a continuance of the condition they were in when he let them, and is therefore guilty of a non-feasance," then there is no reason in principle why the liability should not extend to the lessee's guests on premises devoted to residential purposes strictly.

Certainly, the use of a private dwelling as an "office" for the practice of medicine by the physician-lessee cannot be fairly termed a "public" use in the sense contemplated by our adjudications and the rule enunciated in the restatement. If the rule were designed to be embracive of such utility, there would be no occasion for thus carefully circumscribing it. The walk falls into the category of a private way, in respect of which the landlord was under no duty of care to the tenant's invitees. The law deems such use to be private merely; and there devolves upon the landlord no duty in favor of the tenant's patients or the public in general.

Even in the case of a public sidewalk, it has been held that there is no obligation upon the abutting landowner to maintain it in a state of repair; and, where such duty is imposed by statute or ordinance, its non-performance does not give rise to a cause of action in favor of an individual who suffers injury from a defect due to wear and tear. *Rupp* v. *Burgess*, 70 *N. J. L.* 7; *Braelow* v. *Klein*, 100 *Id.* 156; *Glass* v. *American Stores Co.*, 110 *Id.* 152; *Ford* v. *Jersey Central Power, &c., Co.*, 111 *Id.* 112. See, also, *McKeown* v. *King*, 99 *Id.* 251.

In this view, there is no occasion to determine whether the evidence presents factual issues respecting the occurrence of

the injury during the time within which the landlord had reason to believe that the condition existing at the time of the letting would remain unchanged, and the causal relation between that condition and the injury. The mishap occurred more than two years after the landowner had surrendered possession of the premises to the tenant. And it is also pertinent to observe here that in *Phillips* v. *Library Co., supra,* this court distinguished, as regards liability, between "mere negligence to keep the premises in repair" and "acts of misfeasance, such as placing obstructions or dangerous pitfalls in a way which persons have been permitted to use with the consent of the owner or on his implied invitation."

Secondly, it is maintained that the landowner is liable "for injuries caused to a stranger by a nuisance which existed on the lands prior to a lease and cannot avoid liability by demising the lands."

The foregoing considerations are likewise dispositive of this contention.

The defect was not latent; and, save as herein stated, the tenant's invitees stand in his shoes as regards the landlord's liability for injuries suffered by reason of the ruinous condition of the premises. This is not the case of an injury to the possession arising from the maintenance of a nuisance outside the demised premises—a violation of a duty arising independent of contract. Here, the defective pathway was a part of the leased premises, and, except as noted, the landlord's liability is measured by his contract with the tenant. Unless the use is "public" or "semi-public," as herein defined, the invitees of the lessee enter the demised premises at the latter's invitation alone, and, not being invitees of the landlord also, they have no rights against him save as derived from the lessee. *Durant* v. *Palmer,* 29 *N. J. L.* 544; *Ingwersen* v. *Rankin,* 47 *Id.* 18; *Clyne* v. *Helmes, supra; Ackerman* v. *Ellis,* 81 *Id.* 1; *Krieg* v. *Timken,* 102 *Id.* 307; *Wasilewski,* v. *McQuire Art Shop,* 117 *Id.* 264; *Brownsey* v. *General Printing Ink Co.,* 118 *Id.* 505; *Fraser* v. *Kruger, supra; Webel* v. *Yale University, supra.*

Judgment affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, PAR-
KER, CASE, BODINE, DONGES, HEHER, PERSKIE, PORTER,
DEAR, WELLS, WOLFSKEIL, RAFFERTY, HAGUE, JJ.  14.

*For reversal*—None.