708 A.2d 793

FREDERICK WINKLER, PLAINTIFF, v. ROGER MOTTER, INDI-
VIDUALLY AND D/B/A TOWER STEAK HOUSE, ANTHONY
FRANCHINO AND BERNICE FRANCHINO, DEFENDANTS.

ANTHONY FRANCHINO AND BERNICE FRANCHINO, DEFEN-
DANTS/THIRD PARTY PLAINTIFFS, v. AMERICA'S INSUR-
ANCE CENTER, THIRD PARTY DEFENDANT.

Superior Court of New Jersey
Law Division
Union County

Decided February 7, 1997.

*Stephen S. Weinstein*, for plaintiff.

*Terence M. King*, for defendants–third party plaintiffs Franchinos.

SACHAR, J.S.C.

This action arises from personal injuries plaintiff sustained while an invitee at commercial premises known as "Tower Steak House". The injury was a result of a structural defect. The co-defendant landlord/owner Franchinos moves for summary judgment against plaintiff and co-defendant tenant based on the argument that a commercial landlord is not liable for injuries to a third person where the tenant is in exclusive control of the premises and the tenant was responsible for repairs and/or maintenance of said premises. The motion is opposed on the grounds that because the premises in question were open to the public, the general nonliability of landlords does not apply. This argument is embodied in the *Restatement (Second) of Torts* § 359 (1965), which provides for a public use exception to the general non-liability provision of the *Restatement (Second) of Torts* § 356 (1965). Defendant who is both owner and landlord moves for summary judgment.

## FACTS

On December 24, 1993, plaintiff Frederick Winkler was at the Tower Steak House located at 1047 Route 22 West, Mountainside, New Jersey. Mr. Winkler was present to attend a Jewish singles function sponsored by an organization known as Focus on Singles. There was a cover charge assessed for this singles event as well as other customary charges. The event was held in the downstairs portion of the restaurant, which was often used for banquets and private parties. At the time of the accident, Mr. Winkler was standing at the bar area waiting to order a drink. As he stepped back to allow someone to pass in front of him, an automatic door suddenly swung open and struck him in the back of the head. Mr. Winkler, allegedly dazed by the initial blow, stepped back again

and was struck a second time. According to Mr. Winkler, the bar area and the restaurant were extremely crowded due to the event that night.

The location of the accident was inspected by a Theodore Moss, P.E., an engineer retained by Mr. Winkler's attorney. In a report dated July 21, 1994, Mr. Moss explained the operation of the kitchen door which allegedly struck Mr. Winkler. The report explains that there were two kitchen doors in the area next to the bar, an "in" door and an "out" door. The door which struck Mr. Winkler was the out door, which was used by employees to exit the kitchen. Upon inspection, Mr. Moss reported that in front of each door was a pressure mat which would open the door automatically when an individual stepped on the mat. The mat in front of the door, however, was inoperable. Rather, the door was activated by a proximity sensor mounted at the top corner of the doorway on the kitchen side of the door. The sensor activates the door when anyone passes into or through the area. According to Moss, the sensor system appeared to be a replacement for the original mat system, even though the mats were still in place. The "out" door which struck Mr. Winkler opens into the banquet hall area while the "in" door opens into the kitchen area.

## DISCUSSION

### A.  Sources of Landlord Non–Liability

At common law, a non-possessory lessor generally had no duty to protect a lessee or others on the land against harm from dangerous conditions, whether natural or artificial, which existed at the time of the lease. *Restatement (Second) of Torts* § 356 comment a (1965); W.P. Keeton, *Prosser & Keeton on the Law of Torts* § 63 at 434–35 (5th ed.1984) (hereinafter *Prosser & Keeton*). This doctrine of landlord non-liability was based on the law of property which regards the lease as equivalent to a sale of the premises for the term. *Prosser & Keeton* at 434. Under such a theory, the lessee becomes the owner and occupier of the land,

subject to all the responsibilities and liabilities of one in possession. *Id.* As *Prosser & Keeton* explain:

> In the absence of agreement to the contrary, the lessor surrenders both possession and control of the land to the lessee, retaining only a reversionary interest; and he has no right even to enter without the permission of the lessee. Consequently, the traditional common law rule has been that he is under no obligation to anyone to look after the premises or to keep them in repair, and is not responsible, either to persons injured on or off the land for conditions which develop or are created by the tenant after possession has been transferred.... Furthermore, the doctrine of *caveat emptor* has traditionally been applied to the lessee, quite as much to a vendee, so that a tenant who has not exacted an express warranty is left to inspect the land for himself, and ordinarily at common law must take it as he finds it, for better or for worse. There is therefore, as a general rule, no liability upon the landlord, either to the tenant or to others entering the land for defective conditions existing at the time of the lease.

> [*Prosser & Keeton* § 63 at 434–35.]

This theory is expressed in the *Restatement (Second) of Torts* § 356 (1965), which provides that "[E]xcept as stated in §§ 357–362, a lessor of land is not liable to his lessee or to others on the land for physical harm caused by any dangerous condition, whether natural or artificial, which existed when the lessee took possession." *Restatement (Second) of Torts* § 356 (1965). Several exceptions to the general non-liability rule exist, including an exception for premises open to the public.[1]

## B. *The Public Use Exception*[2]

"Modern ideas of social policy have given rise to a number of exceptions to these general rules of non liability of the lessor,

---

[1] In addition to the public use exception, other exceptions to the rule of non-liability generally apply when: there is a hidden dangerous condition on the premises of which the lessor is aware, but of which the lessee is not; the premises are still in the control of the lessor; or the lessor has negligently repaired the premises or failed to perform on his/her contractual obligations to repair. *Restatement (Second) of Torts* §§ 357–62 (1965).

[2] *See generally,* C.P. Jhong, Annotation, *Landlord's Liability to Tenant's Business Patron Injured as a Result of Defective Condition of Premises,* 17 A.L.R.3d 422 (1968 & Supp.1996); J.F. Rydstrom, Annotation, *What Constitutes a "Public" Use Affecting Landlord's Liability to Tenant's Invitees for Defects in Leased Premises,* 17 A.L.R.3d 873 (1968 & Supp.1996); *Landlord and Tenant/Recent*

which to a large extent swallow up the general no-duty rule." *Prosser & Keeton* § 63 at 435. As comment a to the *Restatement (Second) of Torts* § 356 (1965) explains:

> These exceptions have been due in large part to increasing recognition of the fact that tenants who lease defective premises are likely to be impecunious and unable to make the necessary repairs which their own safety and that of others may demand; that one who is in possession of the premises for a limited term does not have the same incentive to maintain them in good condition as the lessor to whom they will revert at the end of the lease; and that the landlord who receives benefit from the transaction in the form of rent may properly be required to assume in return at least certain limited obligations with respect to the safety of others. These ideas of policy have found expression in statutes in a number of states which require landlords to put and keep certain types of premises, such as multiple dwellings, in good condition and repair.

> [*Restatement (Second) of Torts* § 356 comment a (1965) (citations omitted).]

In accordance with this rationale, *Restatement (Second) of Torts* § 359 (1965) provides:

> A lessor who leases land for a purpose which involves the admission of the public is subject to liability for physical harm caused to persons who enter the land for that purpose by a condition of the land existing when the lessee takes possessions, if the lessor

> (a) knows or by the exercise of reasonable care could discover that the condition involves an unreasonable risk of harm to such persons, and

> (b) has reason to expect that the lessee will admit them before the land is put in safe condition for their reception, and

> (c) fails to exercise reasonable care to discover or to remedy the condition, or otherwise to protect such persons against it.

> [*Restatement (Second) of Torts* § 359 (1965).]

The rationale for this particular exception, as stated in comment a to § 359, "lies in the lessor's responsibility to the public, which he is not free to shift to the lessee in any case where he has reason to expect that the lessee will admit the public before the land is put in reasonably safe condition for their reception." *Restatement (Second) of Torts* § 359 comment a (1965).

---

*Cases: Public Use Doctrine Not Applied to Doctor's Office,* 89 *U. of P. Law Review* 1104 (1941).

## C.   The Public Use Exception in New Jersey

Several opinions from the 1930's, 40's and 50's have approved of the public use exception in New Jersey and have applied it under certain factual scenarios.[3]   None of these opinions have been overruled.   In *Martin v. City of Asbury Park,* 111 *N.J.L.* 364, 168 *A.* 612 (E. & A.1933), the court applied the public use exception to a bathing pavilion owned by the City of Asbury Park and leased to an individual who, in turn, leased one of the bath-houses to the plaintiff.   After a jury verdict in favor of plaintiff and against the city owner, the city appealed arguing, among other things, that the city could not be liable as landlord for injuries sustained by a third person due to the ruinous condition of the premises.   *Id.* at 367, 168 *A.* 612.   In holding that the exception applied to the premises in question, the court stated:

> The true rule undoubtedly is that where an owner designs and devotes a building to public or semi-public use, the public is deemed to be invited to make such use thereof by the owner and the latter cannot evade responsibility of exercising due care to make it reasonably safe by demising it to a tenant.
>
> . . . .
>
> Such a legal doctrine has every power of logic to support it.   To hold that an owner may construct a building to be used for public purposes and in such construction transgress every requirement of structural safety and escape liability therefor by the simple process of leasing to another by whom such public use is carried on would be absurd.
>
> [*Id.*]

Although the *Martin* court focused on the aspect of original construction of the premises for a public purpose, the court in *LaFreda v. Woodward,* 125 *N.J.L.* 489, 15 *A.*2d 798 (E. & A.1940) clearly expanded the doctrine to include any premises used for a public purpose.

---

[3] *See, e.g., Johnson v. Zemel,* 109 *N.J.L.* 197, 160 *A.* 356 (Sup.Ct.1932) (applying the public use analysis to a boxing arena); *Martin v. Asbury Park,* 111 *N.J.L.* 364, 168 *A.* 612 (E. & A.1933) (applying the analysis to a bathing pavilion); *LaFreda v. Woodward,* 125 *N.J.L.* 489, 15 *A.*2d 798 (E. & A.1940) (applying the analysis to a doctor's office); *Trondle v. Ward,* 129 *N.J.L.* 179, 28 *A.*2d 509 (E. & A.1942) (applying the analysis to a hotel); *Marx v. Standard Oil Co. of New Jersey,* 6 *N.J.Super.* 39, 69 *A.*2d 748 (App.Div.1949) (applying the analysis to a gasoline filling station).

In *LaFreda*, a landowner leased a two story dwelling house to a tenant physician who intended to use the ground floor as his physician's office. One of his patients, after falling on the walkway which led from the front door to the sidewalk, brought suit against the landlord. Evidence showed that the concrete surface was in a state of disrepair. The court, while citing the general non-liability of landlords absent fraudulent concealment of a latent defect, recognized the public use exception as espoused in 2 *A.L.I. Torts*, § 359. The court ruled:

> While these cases have reference to buildings "designed" or "constructed" for "public or semi-public use," there would seem to be no reason in principle why buildings "devoted" to such purposes by stipulation of the parties should have an essentially different classification, for the basis of the direct liability imposed upon the landlord is that, by the nature of the use, he is deemed to have extended an invitation to the public to make such use thereof, and so is under a duty to exercise reasonable care for the safety of those who shall respond to the invitation.
>
> . . . .
>
> The use is not to be denominated "public" or "semi-public," within the significance of the rule, merely because it contemplates the admission of a "number" of persons as patrons of the lessee. To warrant that category, it is essential that the number be "large"—in the sense of great as opposed to small. If the premises are adopted to a use that elicits the patronage of a large number of persons, the use is sufficiently public in character to invest the tenant's patrons with the status of persons entering the premises upon the invitation of the landlord, and thus to charge the latter with the duty of care arising out of such relationship. Only in such circumstances does the law deem it politic to impose upon the landlord a duty to the tenant's invitees wholly apart from that bottomed in the tenancy contract.
>
> [*Id.* at 494–95, 15 A.2d 798.]

As is evident, the court clearly approved of the public use exception as then espoused in the first *Restatement of Torts*. The court found, however, that the number of persons invited to the premises was not sufficient to warrant application of the doctrine. It is significant to note, however, that subsequent to the *LaFreda* case, the requirement that the number of persons invited to the premises be "great" has been explicitly overruled by comment d to the *Restatement (Second) of Torts* § 359 (1965), which provides:

> It is not necessary that the public shall enter, or be expected to enter, in large numbers at one time. The rule applies equally where the purpose of the lease involves the admission of the public two or three at a time, as in the case of a small beauty shop, or a doctor's office.

[*Restatement (Second) of Torts* § 359 comment d (1965).]

In *Trondle v. Ward,* 129 *N.J.L.* 179, 28 *A.*2d 509 (E. & A.1942), the court next applied the public use analysis to decide whether the landowner was liable for injuries sustained by a paid hotel guest of the tenants as the result of a latent defect in the leased premises. In *Trondle,* a guest of the hotel brought suit against both the tenant and landlord after she had fallen through a floor board which had given way under her weight. *Id.* at 180, 28 *A.*2d 509. The plaintiff suffered a broken leg and other injuries as a result of the fall. *Id.* Although the court found the proofs insufficient to warrant submission of the case to the jury under a theory of negligence based on the public use exception, the court clearly recognized the *Restatement (Second) of Torts,* § 359 (1965) as "principles, which are firmly imbedded in the jurisprudence of this state." *Id.* at 183, 28 *A.*2d 509. Here, the court found significant the absence of proof that the landowner knew or should have known of the condition or realized that an unreasonable risk was involved. *See id.* at 183, 28 *A.*2d 509. Additionally, the court ruled that plaintiff failed to offer proof as to who constructed the building, its intended purpose at construction, or whether a "large" number of persons were patrons of the tenant, a requirement explicitly overruled by comment d of the *Restatement (Second) of the Law of Torts* § 359 (1965), *see id.*

### D. The Public Use Exception in Other Jurisdictions and the Trend Towards Increased Landlord Liability

As is evident, the public use exception has firm roots in the case law of this state. Likewise, the exception has been cited with approval in many other states. Significantly, several courts have held restaurants, taverns and banquet halls as deserving of "public" status for purposes of the exception.[4] For example, in *Brunton v. Ellensburg Wash. Lodge No. 1102,* 73 *Wash.App.* 891, 872 *P.*2d 47 (Div. 3 1994), the Court of Appeals of Washington,

---

[4] *See e.g.,* cases cited in 17 *A.L.R.*3d 423 § 9 (1968 & Supp.1996); 256 *U.S.* 94, 41 *S.Ct.* 433, 65 *L.Ed.* 837, 17 *A.L.R.* 873 § 11, § 17 (1968 & Supp.1996).

Division 3, Panel 1, held the public use exception to apply to a banquet hall in which a wedding reception was held. Plaintiff, who had slipped on a set of steps,[5] brought suit against the landlord under a theory of negligence. In reversing a grant of summary judgment for the landlord, the Court of Appeals cited the *Restatement (Second) of Torts* § 359 (1965) as an exception to the general rule of landlord non-liability. *See id.* 872 P.2d at 48. The evidence showed that some 80–90 guests were present at the reception. *Id.* The evidence also showed that although the hall was for members only, it was leased that day for the express purpose of the wedding reception. *Id.* In holding the exception applicable, the court ruled that "[I]f a landlord would be liable should he admit the public to the land himself, he should not be allowed to avoid that liability by leasing the land with the intention the public be admitted." *Id.* at 49. The court remanded the case ruling that a genuine issue of material fact existed as to whether the steps constituted a deceptive or dangerous condition.[6] *See id.*

In *Nelson v. Hokuf,* 140 *Neb.* 290, 299 *N.W.* 472 (1941), the Nebraska Supreme Court ruled the exception applicable to premises leased for a beer parlor. Plaintiff customer fell through a trapdoor which was located directly outside the bathroom door. The trapdoor led from the floor to the basement. While plaintiff was using the toilet, an employee opened the trapdoor and plaintiff fell through the opening when he exited the toilet. The court found that the premises were constructed with the trapdoor, and

---

[5] The steps in question were located inside the reception area itself. They consisted of two steps which were approximately 6 feet from the entrance of the reception hall. The steps divided the hall into two levels. The reception hall itself was approximately 34 feet down a hallway from the entrance to the building. The plaintiff broke her pelvis in the fall. *Brunton,* 872 *P.2d* at 48.

[6] There was evidence that the lighting in the hall, combined with the bright sunlight beaming into the hall, made vision difficult. Additionally, there was testimony that the pattern of the carpet made the steps hard to distinguish. An expert report stated that the lighting in the hall was inadequate and the steps were not marked by visual cues such as contrasting carpeting or handrails. *Brunton,* 872 *P.2d* at 49.

the premises were being used by the lessee for the purposes which he leased them. Additionally, the landlord had been warned that the trapdoor could pose a danger when opened. The court applied the exception to the premises and ruled that the use of the premises by the tenant contemplated that the trap door would be opened, and when it was used, and especially so when the toilet was being used, this constituted a dangerous condition. Further, the court stated that the landlord must have contemplated that the premises, including the toilet, would be used by patrons when the trapdoor was open as well as when it was closed.

The Supreme Court of Arizona, in *Spain v. Kelland,* 93 *Ariz.* 172, 379 *P.*2d 149 (1963), applied the public use exception to hold a landlord liable for injuries sustained by a patron in a tavern who had tripped over a fireplace hearth. In *Spain,* the evidence showed that the landlord had built the building and that the premises had not been altered in any significant way by the tenant. Therefore, the jury had found that the dangerous condition existed at the time the landlord leased the tavern and that the landlord knew or should have known of the danger that a patron would be hurt because of its existence. In affirming the jury verdict in favor of the invitee and against the landlord, the Arizona Supreme Court clearly adopted the public use exception. Interestingly, the court also rejected the notion that a large number of persons must be invited to the premises to warrant "public" status for purposes of the exception. The court ruled:

> We adopt the majority rule and do not limit the "public use" exception to situations where the lease contemplates a large number of people *at the same time.* And where the majority rule is in effect the exception has justified imposing liability on a landlord for injuries received by an invitee of his tenant, caused by a structural defect in a beer parlor, *Nelson v. Hokuf,* 140 *Neb.* 290, 299 *N.W.* 472.
>
> [*Spain* at 379 *P.*2d at 152.]

Although not applying the exception under the factual scenario presented, the New York Supreme Court, Appellate Division, in the case of *Strade v. Ryan,* 97 *A.D.*2d 880, 470 *N.Y.S.*2d 707 (3 Dept.1983), applied the exception to analyze a slip and fall in a restaurant. In *Strade,* the court declined to apply the exception

because the slip and fall occurred in an area, a ramp, which was not open to the public but was only used by employees of third party defendant. *See id.* 470 *N.Y.S.*2d at 708. The court, however, clearly cited the doctrine with approval as the law of New York to be applied under the proper factual scenario. In fact, the court expressly declined to find the New York case recognizing the exception, *Campbell v. Elsie S. Holding Co.,* 251 *N.Y.* 446, 167 *N.E.* 582 (1929), as overruled by later case-law. *See id.* Accordingly, *Strade* must be read to hold, among other things, that the public use exception is a viable doctrine in the state of New York.

The public use exception, as applied in the various jurisdictions, may reflect a trend away from landlord non-liability in commercial settings. For example, in 1994 the Supreme Court of Hawaii, in the case of *Hao v. Campbell Estate,* 76 *Hawai'i* 77, 869 *P.*2d 216 (1994), adopted the public use exception as the law of that state under the limited circumstances described in the *Restatement (Second) of Torts* § 359 (1965).[7] In *Hao,* the court had to decide whether to apply the exception to the owner of a motorcycle track after a racer was injured during a race. The court held the exception inapplicable because the accident occurred in a part of the premises not open to the public, the racetrack itself. *Hao v. Campbell Estate,* 869 *P.*2d at 221–22. Although declining to apply the exception under the facts presented, the Hawaii court clearly approved of and adopted the exception as its law.

*E. The Public Use Exception Applied to the Facts Presented*

Based on the cases discussed and the clear language of the *Restatement,* it is evident that facts presented in opposition to the

---

[7] The Court, however, refused to apply the exception under the facts presented. In *Hao,* the Court had to decide whether to apply the newly adopted exception to the owner of a motorcycle track after a racer was injured during a race. Although clearly adopting the exception as the law of Hawaii, the Court held the exception inapplicable because the accident occurred in a part of the premises not open to the public, the racetrack itself. *Hao v. Campbell Estate,* 869 *P.*2d at 221–22.

grant of summary judgment preclude the grant of summary judgment as a matter of law in this case. The premises in question are public for purposes of the exception. Although the *Restatement (Second) of Torts* § 359 comment d (1965) states that the numbers of persons entering the premises need not be in large numbers at one time, the court in *LaFreda*, clearly espoused the rule in New Jersey that the use of the premises contemplate the patronage of a large or great number of persons. Here, the plaintiff testified in deposition that the downstairs banquet area was "packed" with people.[8] Plaintiff also testified that because the event was held on Christmas Eve, this event was the largest Jewish singles function of the year. Clearly, the numbers here are "great" as opposed to small.

Second, the *Restatement (Second) of Torts* § 359 comments e and f (1965) inform that the liability is based upon the fact that the lessor knows that the land is to be thrown open to the public for entry, while it is in the same condition as when he gives possession to his lessee, and that the lessor's liability is limited to those parts of the premises which, under the express or implied terms of the lease, are to be thrown open for the admission of the public. Here, Mr. Franchino testified that he knew the lower level was used for catering and for parties.[9] Further, the accident happened in an area thrown open to the public. Although an argument could be made that the mat in front of the kitchen door was not an area open to the public, plaintiff testified that he stepped on the inoperative mat and in front of the kitchen door because the crowd at the bar was three to four people deep. Plaintiff stepped back a step, he testified, to allow another patron who was exiting the bar area to pass. In effect, plaintiff was forced in front of the

---

[8] See plaintiff's deposition at pages 39–40. Plaintiff also testified that when he first arrived at about 9:00 p.m. he was in the lower level of the premises. Plaintiff testified he then went upstairs to mingle. After about a half hour, he attempted to go back downstairs, but there was a ten minute wait to use the stairs leading to the lower level. *Id.* at 40.

[9] See Franchino deposition at page 33.

kitchen door because of the crowd that was attending the event. The evidence presented that the premises were in the same condition as they were when the premises were leased.

This ruling is clearly distinguishable from the Appellate Division's recent decision in *McBride v. Port Auth. Of N.Y. and NJ,* 295 *N.J.Super.* 521, 685 *A.*2d 520 (App.Div.1996). In *McBride,* the plaintiff was injured when the vehicle he was driving on his employer's loading dock struck a hole and caused plaintiff to fall from the vehicle and sustain injuries. In reversing a jury award in favor of plaintiff and against the landlord, the court held that an employee of a commercial tenant in exclusive possession could not hold the tenant's landlord liable for personal injuries suffered on the leased premises, due to a lack of proper maintenance or repair, when the lease unquestionably placed the responsibility for such repair on the tenant. The issue presented on the summary judgment currently before this court, however, does not concern the duty to repair or maintain defects in premises that occur after the lease is entered. In the case at bar, the door had been altered so that the electric eye caused the door to swing outward. This change was effective before the change of ownership occurred. Nor did the holding in *McBride* deal in the factual context of a public use exception case.

The public use exception is a legitimate imposition of a duty to protect the public from dangerous conditions that should be detected and remedied by those with the resources and impetus to do so. As the New Jersey Supreme Court recently stated in *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 625 *A.*2d 1110 (1993), a case in which the Court imposed a duty upon a real estate broker to inspect and warn of dangerous conditions, "one of the main functions of tort law is to prevent accidents rather than simply to provide legal redress to an injured party." *Id.* at 448, 625 *A.*2d 1110. That policy is clearly furthered by this decision. As is further indicated by the facts of this case, the public use exception serves to prevent a landlord from shifting liability to an impecunious tenant where the public's interest is thereby jeopar-

dized. It was the financial straits of the Motters that caused the change of ownership to the Franchinos and a lease thereupon on a month to month basis to be extended to the Motters. To insulate the landlord from liability while insuring the payment of rent to the landlord from the impecunious operator of the banquet facilities, would put the public at risk without accountability of the landlord.

## Conclusion

The public use exception as espoused in the *Restatement (Second) of Torts* § 359 and the case law of New Jersey has continued viability, and as such, the public use exception clearly applies to the banquet reception held at the Tower Steak House on December 24, 1993. The summary judgment motion of defendants Franchinos is hereby denied. It is for a jury to determine whether Mr. Franchino was negligent in his failure to discover and remedy the defect.