902 A.2d 885

FRANKLIN MUTUAL INSURANCE COMPANY, AS SUBROGEE OF BELCHER'S VILLAGE MARKET, PLAINTIFF–APPELLANT, v. JERSEY CENTRAL POWER & LIGHT COMPANY, D/B/A GPU ENERGY, DEFENDANT–RESPONDENT, AND JOHN DOES, 1 THROUGH 100 (FICTITIOUS NAMES), DEFENDANTS.

Argued March 7, 2006—Decided July 27, 2006.

*Mauro C. Casci,* argued the cause for appellant (*Mr. Casci,* attorney; *Adam E. Levy,* on the briefs).

*Gavin J. Rooney,* argued the cause for respondent (*Lowenstein Sandler,* attorneys, *Mr. Rooney* and *Matthew R. Savare,* on the briefs).

*Cristina N. Patel,* Deputy Attorney General, submitted a brief on behalf of *amicus curiae* New Jersey Board of Public Utilities (*Zulima V. Farber,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel).

*Susan Stryker,* submitted a brief on behalf of *amici curiae* Insurance Council of New Jersey, Property Casualty Insurers Association of America and National Association of Mutual Insurance Companies (*Sterns & Weinroth,* attorneys; *Ms. Stryker, Mitchell A. Livingston* and *Erica S. Helms,* on the brief).

*Stephen B. Genzer,* submitted a brief on behalf of *amicus curiae* New Jersey Utilities Association (*Saul Ewing,* attorneys; *Mr. Genzer* and *Mark L. Mucci,* on the brief).

PER CURIAM.

In *Weinberg v. Dinger,* 106 *N.J.* 469, 495, 524 *A.*2d 366 (1987), we held, in accordance with modern principles of tort liability, that a utility has a duty to act with reasonable care in the provision of service to foreseeable users, rejecting a line of cases that was based solely on the then-current tort law notion that a defendant owed no duty of care to a third party with whom no privity of contract existed. *See, e.g., Reimann v. Monmouth Consol. Water Co.,* 9 *N.J.* 134, 137–38, 87 *A.*2d 325 (1952) (water company not liable to third parties for negligent provision of service); *Cochran v. Public Serv. Elec. Co.,* 97 *N.J.L.* 480, 481, 117 *A.* 620 (E. & A.1922) (electric company not liable to third parties for negligent provision of service); *Baum v. Somerville Water Co.,* 84 *N.J.L.* 611, 614–15, 87 *A.* 140 (E. & A.1913) (water company not liable to third parties for negligent provision of service).

However, in *Weinberg,* because we were concerned about the effect of our decision on the public utility ratepayers on whom the burden of costly subrogation recoveries ultimately would fall, we allowed only uninsured or underinsured property owners to sue errant utilities and barred insurers' subrogation claims [1] for damages resulting from service interruptions. *Weinberg, supra,* 106 *N.J.* at 489–95, 524 *A.2d* 366. In ruling, we compared utilities to public entities, which the Legislature has insulated from subrogation claims by way of the Tort Claims Act. *Id.* at 492, 524 *A.2d* 366 (citing *N.J.S.A.* 59:9–2). We concluded that

> the imposition on a water company of liability for subrogation claims of carriers who pay fire losses caused by the company's negligent failure to maintain adequate water pressure would inevitably result in higher water rates paid by the class of consumers that paid for the fire insurance. The result of imposing subrogation-claim liability on water companies in such cases would be to shift the risk from the fire-insurance company to the water company, and, ultimately, to the consumer in the form of increased water rates. Thus, the consumer would pay twice—first for property insurance premiums, and then in the form of higher water rates to fund the cost of the water company's liability insurance. We find this result contrary to public policy.

> [*Ibid.*]

Nevertheless, we expressly left open the possibility that we would reconsider that rule:

> This determination is made without prejudice to the right of a subrogation claimant, either in this or other litigation, to offer proof tending to demonstrate that any increase in water rates resulting from liability for subrogation claims would be substantially offset by reductions in fire-insurance premiums.... [O]ne would expect a high correlation between the increase in water company liability rates and the decrease in fire-insurance rates occasioned by the abrogation of water company immunity in cases like this. If that correlation were to be proven in subsequent litigation, we would be prepared to reconsider our denial of the carrier's right to subrogation against a water company.

> [*Id.* at 493, 524 *A.2d* 366.]

---

[1] In a subrogation claim, "the insurer is 'substituted' for the insured regarding either all or some portion of the rights that the insured has to receive compensation from another source. An insurer asserting a subrogation right is usually viewed as 'standing in the shoes' of the insured." 15 Eric Mills Holmes, *Holmes' Appleman on Insurance* § 113.1 at 384, n. 10 (2d ed. 2000).

Justices Handler and Garibaldi filed separate opinions in which they questioned, among other things, whether such an initiative should come from the Legislature. *Id.* at 497–98, 524 *A.2d* 366 (Handler, J., concurring in part and dissenting in part); *id.* at 507–08, 524 *A.2d* 366 (Garibaldi, J., dissenting). The opinion in *Weinberg* is at the heart of this case.

On this appeal, involving the dismissal of an insurer's subrogation claim against an electric company,[2] we have been asked to determine whether the so-called "subrogation carve-out" of *Weinberg* was limited to water companies or whether it insulates other utilities from subrogation actions for service interruptions. In addition, we have been asked to reconsider the subrogation carve-out. We hold that *Weinberg* applies to all regulated utilities in service interruption cases and that there is no warrant to alter the subrogation carve-out at this point.

We begin with the determination of the trial judge and Appellate Division that *Weinberg's* subrogation carve-out is not limited to water companies, a holding with which we are in full agreement. Although *Weinberg* happened to arise in the context of a water company case, it cannot fairly be read as so limited. Indeed, the subrogation carve-out in *Weinberg* was specifically based on the status of the water company as a regulated utility and was rooted in the protection of members of the rate-paying public who would ultimately bear the burden of subrogation recoveries through increased water rates. Those considerations are identical where other utilities are concerned, and neither Franklin Mutual nor the

---

[2] In 1999, plaintiff Franklin Mutual Insurance Company (Franklin Mutual) was the insurer of Belcher's Village Market in Branchville, New Jersey. On September 15 of that year, Hurricane Floyd struck New Jersey, bringing with it widespread interruptions in electricity service from September 15 to 21, 1999, including interruptions to customers of defendant Jersey Central Power & Light Company (JCP&L). Among those customers was Belcher's. As a result of the power interruption, Belcher's submitted a claim for the cost of spoiled food to Franklin Mutual. Pursuant to the terms of its policy, Franklin Mutual paid Belcher's $6,255.78 for its losses and instituted a subrogation action against JCP&L.

amici insurance associations [3] have suggested any distinction between water companies and other utilities that would justify disparate treatment. Thus, we affirm the Appellate Division's entirely logical conclusion that "the same rationale" that motivated the *Weinberg* Court to bar subrogation suits against water companies in service interruption cases is equally present in the case at bar.

That brings us to the question of whether the subrogation carve-out of *Weinberg* should be maintained. We find the carve-out troubling insofar as it insulates utilities from paying for the damages they cause to property owners whose service is negligently interrupted. That is contrary to our tort law, which has always recognized that the burden of loss should fall, as a matter of justice, on the party at fault. *See, e.g., People Express Airlines, Inc. v. Consol. Rail Corp.*, 100 *N.J.* 246, 255, 495 *A.*2d 107 (1985).

However, we are loath to interfere with the application of the rule at this juncture for several reasons. First, in the case of a utility that can pass losses on through rate increases, the classic "just deserts" operation of tort law loses some of its currency. At the same time, under the *Weinberg* rule, the innocent victim is made whole through insurance or in a direct action against the utility, thus satisfying the compensatory principle underlying our tort law.

Second, the *Weinberg* rule has now been in effect for almost twenty years. Thus, the concerns of the dissenters in that case to the effect that the Legislature is the proper forum to decide the subrogation carve-out, to some extent, have been mitigated. Indeed, the Legislature is presumed to be aware of *Weinberg* and to have acquiesced in its ruling. *See Taneian v. Meghrigian*, 15 *N.J.* 267, 279, 104 *A.*2d 689 (1954).

---

[3] We invited the Insurance Council of New Jersey, the Property Casualty Insurers Association of America, and the National Association of Mutual Insurance Companies to participate as amici curiae.

Third, and most important, the necessary prerequisite to an informed re-examination of *Weinberg* is absent: we have not been offered proof tending to demonstrate that any increase in utility rates resulting from liability for subrogation claims would be substantially offset by reductions in insurance premiums. *Weinberg, supra,* 106 *N.J.* at 493, 524 *A.*2d 366. Indeed, we note that at least one scholar points out that "no decision reports that insurers have even attempted to demonstrate a relationship between subrogation rights and premium rates." James M. Fischer, *Why are Insurance Contracts Subject to Special Rules of Interpretation?: Text Versus Context,* 24 *Ariz. St. L.J.* 995, 1024 n. 95 (1992). Thus, we continue to be concerned over the public "paying twice," first through insurance premiums and then through increased utility rates reflecting subrogation losses. Until we are satisfied that the public will not suffer that disadvantage, we decline to alter the subrogation rule of *Weinberg.*

The judgment of the Appellate Division is affirmed.

*For Affirmance*—Chief Justice PORITZ, and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA-SOTO—7.

*Opposed*—None.