73 A.3d 465

POTOMAC INSURANCE COMPANY OF ILLINOIS, BY ITS TRANS-FEREE, ONEBEACON INSURANCE COMPANY, PLAINTIFF–RESPONDENT, v. PENNSYLVANIA MANUFACTURERS' ASSO-CIATION INSURANCE COMPANY, DEFENDANT–APPEL-LANT, AND NEWARK INSURANCE COMPANY AND ROYAL INSURANCE COMPANY, DEFENDANTS.

Argued April 30, 2013—Decided September 16, 2013.

*James P. Lisovicz* argued the cause for appellant (*Coughlin Duffy*, attorneys; *Mr. Lisovicz, Timothy P. Smith, Joseph C. Amoroso*, and *Brooks H. Leonard*, on the briefs).

*Elliott Abrutyn* argued the cause for respondent (*Morgan Melhuish Abrutyn*, attorneys; *Mr. Abrutyn* and *James L. Melhuish*, on the brief).

Justice PATTERSON delivered the opinion of the Court.

In this insurance coverage litigation, arising from a construction dispute, we address the allocation of defense costs incurred by the common insured of several carriers. We consider, for the first time, whether one insurer with an obligation to indemnify and defend the insured has a direct claim for contribution against its co-insurer for defense costs arising from continuous property damage litigation. We also consider whether such a claim was extinguished when the insured gave up its claims against the co-

insurer in a release negotiated and signed only by the insured and the co-insurer.

The dispute arose from construction litigation brought by the Township of Evesham (Evesham) against a contractor, Roland Aristone Inc. (Aristone), for property damage. Although plaintiff, OneBeacon Insurance Company (OneBeacon) paid half of Aristone's legal fees and defense expenses, Pennsylvania Manufacturers' Insurance Company (PMA), which also insured Aristone, initially disclaimed coverage and did not pay any of Aristone's defense costs. After a declaratory judgment action filed by Aristone against PMA was settled, PMA contributed to a portion of Aristone's settlement with Evesham, and Aristone released its claims against PMA.

This action was filed by OneBeacon against PMA and an additional insurer seeking reimbursement for the cost of Aristone's defense. The trial court found in OneBeacon's favor, recognizing a direct right of action by the insurer against its co-insurers for defense costs. Given the limited scope of the release, which was signed by Aristone but not by OneBeacon, the trial court rejected PMA's argument that Aristone's release of PMA had extinguished OneBeacon's contribution claim. The court allocated Aristone's defense costs among the insurers and entered judgment in OneBeacon's favor against PMA.

The Appellate Division affirmed the portion of the trial court's decision allocating defense costs among the several insurers. *Potomac Ins. Co. of Ill. ex rel. OneBeacon Ins. Co. v. Pa. Mfrs. Ass'n Ins. Co.*, 425 *N.J.Super.* 305, 329, 41 *A.*3d 586 (App.Div.2012). The panel relied on a leading California appellate case and New Jersey law, reasoning that its recognition of the insurer's right of contribution against its co-insurer comports with the apportionment method adopted by this Court in *Owens–Illinois Inc. v. United Insurance Co.*, 138 *N.J.* 437, 475–76, 650 *A.*2d 974 (1994), and *Carter–Wallace, Inc. v. Admiral Insurance Co.*, 154 *N.J.* 312, 325–28, 712 *A.*2d 1116 (1998). *Potomac, supra*, 425 *N.J.Super.* at 320–24, 41 *A.*3d 586. It recognized OneBeacon's claim for contribu-

tion against PMA and affirmed the trial court's holding that OneBeacon's claim was not extinguished by the release negotiated by Aristone and PMA.

We hold that, in light of each insurer's obligation to indemnify and defend Aristone for a portion of the period in which the continuing property damage occurred, the trial court properly held that OneBeacon has a contribution claim against PMA. Allocation of defense costs in the circumstances here serves important objectives articulated by this Court in *Owens–Illinois* and *Carter–Wallace:* conservation of the parties' resources, fostering of a prompt and fair resolution of litigation, creation of incentives for policyholders to maintain coverage, and fair and equitable allocation of the cost of litigation to all responsible carriers. We further affirm the finding of the trial court, also affirmed by the Appellate Division, that the release negotiated by Aristone and PMA had no effect on OneBeacon's claim for contribution against PMA because OneBeacon was not a party to that release.

Accordingly, we affirm the judgment of the Appellate Division.

I.

In an agreement dated October 1, 1991, Evesham retained Aristone to serve as the general contractor in the construction of a new middle school, the DeMasi School, for the sum of $14,566,000. On November 11, 1991, Aristone entered into a subcontract with Ertle Roofing and Sheet Metal Works (Ertle) for the installation of the school's roof and related construction. The contract between Aristone and Ertle required Ertle to indemnify and hold harmless Aristone and others "from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from" Ertle's performance of the contract. The indemnity agreement covered any "claim, damage, loss or expense ... attributable to ... injury to or destruction of tangible property other than the [roof and related materials installed by Ertle] including loss of use resulting therefrom, but

only to the extent caused in whole or in part by negligent acts or omissions" of Ertle, its subcontractors or their employees.

The construction of the DeMasi School took place over approximately two years and was completed in 1993. Beginning in its first year of use, the school experienced leakage and other defects, principally related to the roof. On December 20, 2001, Evesham filed an action in which it asserted claims for negligence and breach of contract against Aristone, the project architect, and the construction manager, and sought enforcement of a surety's obligation on a performance bond. Evesham sought compensatory damages, including remediation costs that were yet to be incurred, as well as attorneys' fees and other relief.

Evesham's negligence and breach of contract action prompted Aristone to notify its five insurance carriers of the claim and to demand that the carriers indemnify and defend it. For the first two years of the relevant period, July 1, 1993, through July 1, 1995, Aristone was insured under two consecutive commercial general liability (CGL) policies issued by PMA, which provided coverage for defense costs as well as indemnity. The CGL policies between Aristone and PMA provided that PMA had "the right and duty to defend any 'suit' seeking ... damages." In addition, PMA agreed to "pay, with respect to any claim or 'suit' [it] defend[ed,] ... [a]ll expenses [PMA] incur[red]." In a section entitled "Other Insurance," and subtitled "Method of Sharing," PMA agreed that "[i]f all of the other insurance permits contribution by equal shares, [it would] follow this method also." PMA acknowledged in this section that "[u]nder this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first." Nowhere in this section, however, did the contract specify whether the "Method of Sharing" encompassed legal fees in addition to the insured's covered loss.

In addition to PMA, other insurance carriers provided coverage to Aristone during portions of the relevant period. Between July 1, 1995, and July 1, 1996, Newark Insurance Company (Newark)

insured Aristone under a CGL policy. During the period between July 1, 1996, and July 1, 1997, Royal Insurance Company of America (Royal) insured Aristone under a CGL policy.[1] For the period from July 1, 1997, to July 1, 1998, OneBeacon, as the transferee of Potomac Insurance Company of Illinois (Potomac), insured Aristone under a CGL policy. Between July 1, 1998, and July 1, 2003, Selective Way Insurance Company (Selective) insured Aristone under five CGL policies. Each policy had a coverage limit of $1,000,000 per occurrence.

Selective and OneBeacon paid Aristone's legal fees and other defense costs as Evesham's action against Aristone proceeded.[2] In contrast to Selective and OneBeacon, PMA and Royal disclaimed any obligation to indemnify or defend Aristone, citing language in their respective policies.

The position taken by PMA and Royal prompted Aristone to file a declaratory judgment action against them on June 3, 2004. Aristone and PMA agreed to arbitrate their dispute. While the arbitrator's decision was pending, Aristone offered to settle its dispute with PMA for $270,000. That amount represented what Aristone "perceive[d] to be PMA's indemnity and retroactive defense obligations." The parties, however, were unable to agree on settlement terms. The arbitrator found that PMA had a duty

---

[1] Royal assumed the obligations of its former subsidiary, Newark, under the latter's CGL policy issued to Aristone for the 1995–1996 policy period, reducing the number of insurers involved in this dispute from five to four.

[2] On September 2, 2002, Aristone's counsel filed a third-party complaint against the roofing installer, Ertle, citing the defense and indemnity clause of the contract between Aristone and Ertle. For the relevant period, Ertle was insured by Camden Fire Insurance Association (Camden), another affiliate of OneBeacon. On the Camden policy, Ertle had not named Aristone as an additional insured, as required by the policy as a condition of coverage for Aristone. In response to Aristone's tender of its defense, OneBeacon took the position that it was not required to defend Aristone by virtue of Ertle's contractual obligation to indemnify and defend Aristone. OneBeacon decided, however, to assume Aristone's defense based upon the policy issued by Potomac providing coverage for one year, from July 1, 1997, to July 1, 1998.

under its policies to cover Aristone and share in Aristone's litigation costs.[3] The arbitrator issued an award allocating a portion of those costs to PMA.

The arbitrator's award triggered settlement discussions between Aristone and PMA, eventually resulting in an agreement. PMA agreed to contribute $150,000 toward the resolution of Aristone's underlying dispute with Evesham in exchange for Aristone's release. Counsel for PMA and Aristone agreed upon the terms of the release, which was executed on March 2, 2007. In that document, which was not negotiated or signed by any of Aristone's insurers other than PMA, Aristone released PMA from all claims, "including, without limitation, any and all claims by Aristone concerning PMA's obligation to pay the attorneys' fees and costs incurred in defense" of the Evesham action.

Three days after Aristone signed the release, it settled its litigation with Evesham for a total of $700,000. In addition to the $150,000 contributed by PMA on Evesham's behalf, OneBeacon paid $150,000, Selective paid $260,000 and Royal paid $140,000.

The settlement of the underlying action between Aristone and Evesham left unresolved the issue of defense costs incurred by Selective and OneBeacon in defending Aristone. On June 20, 2007, OneBeacon informed PMA and Royal that the defense costs, including legal fees, expert fees and other costs, totaled $528,868.54. OneBeacon represented that it had paid fifty percent of the legal costs and that Selective had paid the other fifty percent. Invoking the "continuous trigger" methodology of *Owens–Illinois, supra,* 138 *N.J.* at 478–79, 650 *A.*2d 974, OneBeacon proposed the following allocation of the $528,868.54: fifty percent, or $264,434.27, to be paid by Selective; ten percent, or $52,886.87, to be paid by OneBeacon; twenty percent, or $105,773.70, to be

---

[3] Consistent with the parties' arbitration agreement, most of the arbitrator's decision was deemed confidential and is not part of the record in this litigation. Neither party appealed the arbitrator's award.

paid by PMA; and twenty percent, or $105,773.70, to be paid by Newark/Royal.

PMA and Royal declined to pay a share of the defense costs, and this litigation followed.

## II.

OneBeacon filed its complaint in this action on July 27, 2007. It asserted that PMA and Royal had failed to pay their respective shares of Aristone's defense costs in Evesham's litigation against Aristone and sought reimbursement of those defense costs and other relief.[4] PMA and Royal denied liability, and PMA pled an affirmative defense asserting that OneBeacon's complaint was barred by Aristone's March 2, 2007 release in PMA's favor.

The parties cross-moved for summary judgment. Citing factual disputes with respect to the intent of Aristone and the defendant insurers when they resolved the underlying litigation, the motion judge denied all parties' summary judgment motions. Royal then settled its dispute with OneBeacon. PMA unsuccessfully sought appellate review of the trial court's denial of its summary judgment motion and filed a second motion for summary judgment, which was also denied.

The trial court conducted a three-day bench trial in October 2009. OneBeacon's claims consultant testified that OneBeacon and Selective each spent approximately $264,000 defending Aristone against the claims of Evesham. The consultant testified that, on OneBeacon's behalf, he instructed Aristone's counsel that if One-Beacon could settle with Evesham for $91,000, it would absorb its half of the defense costs and forgo an action against the two insurers who had not shared in those costs. The claims consultant testified that the relationship among the insurers then "soured" and that OneBeacon was compelled to pay the much larger sum of

---

[4] OneBeacon also named Newark, a former subsidiary of Royal, as a defendant. Royal answered on Newark's behalf, and the parties stipulated to the dismissal of OneBeacon's claims against Newark.

$150,000 to settle the underlying claim. According to OneBeacon's claims consultant, when OneBeacon eventually resolved its dispute with Aristone, it did so with the intent to later pursue its claim against Royal and PMA for a portion of the defense costs incurred by Aristone.

PMA portrayed its settlement with Aristone in starkly different terms. The claims manager and the attorney who negotiated with Aristone on PMA's behalf testified about PMA's intent when it resolved its dispute with Aristone. They stated that the $150,000 settlement amount agreed upon by Aristone and PMA was intended by both parties to include all of PMA's obligations under the two policies that it had issued to Aristone, including any outstanding claims for defense costs. PMA's former counsel testified that in order to carry out PMA's intent, he included in the original draft of the release to be signed by Aristone language barring any later claim by a successor to Aristone's rights under the policy.

Aristone's counsel countered PMA's argument. He testified that he revised PMA's draft release in several respects, intending to make clear that the release affected nothing other than the dispute between PMA and Aristone. He contended that Aristone never intended to limit claims by OneBeacon against PMA for defense costs. Aristone's counsel stated that he told one of PMA's representatives that OneBeacon would not be a party to the release and that the $150,000 settlement figure was agreed upon not because that amount included defense costs but because $150,000 was the sum necessary to achieve the $700,000 total settlement demanded by Evesham.

The trial court ruled in OneBeacon's favor. It found that PMA was aware from the inception of settlement discussions that OneBeacon would not be a party to the settlement between PMA and Aristone. The court further concluded that OneBeacon did not sign the release or participate in the settlement except to pay Aristone's legal fees. It determined that there was never an agreement between PMA and OneBeacon by which the latter gave up its right to sue the former for an allocation of defense costs.

Accordingly, the trial court held that OneBeacon preserved its contribution claim against Aristone's other insurers and that it did not surrender that claim when it settled with Aristone. It ruled that the $700,000 settlement represented only indemnity payments by the insurers and that the settlement did not incorporate defense costs.

The trial court also apportioned the $528,868.54 in defense costs incurred by Aristone. Using the formula set forth by this Court in *Carter–Wallace, supra,* 154 *N.J.* at 326–27, 712 *A.*2d 1116, the trial court allocated thirteen percent of the defense costs, or $68,752, to OneBeacon and, therefore, held that it had overpaid by $195,000. It found that PMA was liable for sixteen percent of the total defense costs, or $84,618.76. Judgment was entered in that amount in OneBeacon's favor. OneBeacon was also awarded $74,308.97 in legal fees in connection with its action against PMA, and PMA was ordered to pay OneBeacon $12,430.51 in prejudgment interest, for a total judgment in the amount of $171,358.24.

PMA appealed. The Appellate Division affirmed the trial court's determination regarding OneBeacon's right to recover defense costs from PMA. *Potomac, supra,* 425 *N.J.Super.* at 308, 41 *A.*3d 586. Noting that the issue before it had not been addressed in a New Jersey appellate case, the panel relied upon a California decision, *Fireman's Fund Insurance Co. v. Maryland Casualty Co.,* 65 *Cal.App.*4th 1279, 77 *Cal.Rptr.*2d 296, 309 (1998), in which the court recognized a direct right of action by one insurer of a common insured against another insurer for the defense costs arising out of the same risk. *See Potomac, supra,* 425 *N.J.Super.* at 321–24, 41 *A.*3d 586. The panel concluded that the principles of California law articulated in *Fireman's Fund* were consistent with the "continuous trigger" allocation of indemnity and defense costs that was adopted by this Court in *Owens–Illinois, supra,* 138 *N.J.* at 478–79, 650 *A.*2d 974. *Potomac, supra,* 425 *N.J.Super.* at 323, 41 *A.*3d 586. Applying the California appellate court's holding in *Fireman's Fund* and citing the general equitable principles articulated in *Owens–Illinois,* the Appellate

Division held that OneBeacon had a direct claim against PMA for allocation of defense costs. *Potomac, supra,* 425 *N.J.Super.* at 323–24, 329, 41 *A.*3d 586. The panel concurred with the trial court's finding that there was no meeting of the minds between Aristone and PMA with respect to whether the release encompassed OneBeacon's claim against PMA for defense costs. *Id.* at 325–28, 41 *A.*3d 586. Accordingly, it rejected PMA's contention that the release barred OneBeacon's claim against PMA for defense costs. *Id.* at 327–28, 41 *A.*3d 586.

We granted PMA's petition for certification and denied OneBeacon's cross-petition for certification.[5] 212 *N.J.* 105, 50 *A.*3d 672 (2012).

## III.

PMA contends that the Appellate Division created a novel cause of action, permitting an insurance company that has already settled with its insured to be sued for a share of defense costs by a co-insurer. It relies upon this Court's decision in *Childs v. New Jersey Manufacturers Insurance Co.,* 108 *N.J.* 506, 515, 531 *A.*2d 723 (1987), for the proposition that, in a setting similar to the one presented here, the trial court was not authorized to recognize a direct right of contribution among insurers. PMA also argues that the Appellate Division mistakenly applied California law, which is premised upon a different method of allocation than that adopted in New Jersey, and that any right of contribution in New Jersey is premised upon subrogation principles, rather than being an independent claim to be asserted by an insurer.

---

[5] The Appellate Division reversed the trial court's award of counsel fees to OneBeacon, based upon the doctrine of unclean hands, on the ground that OneBeacon elected to pursue its contribution claim in a second action rather than in the original litigation. *Potomac, supra,* 425 *N.J.Super.* at 328–29, 41 *A.*3d 586. The panel held that each of the litigating carriers, OneBeacon and PMA, should bear its own legal fees. *Id.* at 329, 41 *A.*3d 586. We denied OneBeacon's cross-petition for certification on this issue, and accordingly, OneBeacon's application for attorneys' fees is not before the Court.

OneBeacon counters that its right to recover a share of Aristone's defense costs from PMA is entirely consistent with New Jersey's approach to allocation of costs among carriers that provide coverage to a common insured. OneBeacon argues that this action does not seek additional defense costs as PMA suggests, but rather PMA's proportionate share of defense costs incurred in Aristone's litigation against Evesham. OneBeacon argues that the Appellate Division's recognition of its claim for defense costs is consistent with this Court's holding in *Owens–Illinois* and that it did not surrender any claim against PMA by virtue of the release negotiated between Aristone and PMA.

## IV.

We consider the determination of the trial court under two distinct standards of review. To the extent that the trial court's ruling constitutes a determination of law that OneBeacon may assert a claim for contribution against PMA, we review it de novo and afford no deference to the trial court. *Estate of Hanges v. Metro. Prop. & Cas. Ins. Co.*, 202 *N.J.* 369, 382–83, 997 *A.*2d 954 (2010); *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995). In contrast, the trial court's factual findings regarding the scope and impact of the release signed by Aristone are entitled to substantial deference. Factual findings premised upon evidence admitted in a bench trial "are binding on appeal when supported by adequate, substantial, credible evidence." *Cesare v. Cesare*, 154 *N.J.* 394, 411–12, 713 *A.*2d 390 (1998) (citing *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.*, 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974)).

This Court has not previously considered the primary issue raised by this appeal: whether an insurer may assert, against a co-insurer, a claim for defense costs incurred in litigation that arises from property damage manifested over a period of several years, during which the policyholder is insured by successive carriers.[6]

---

[6] In the relatively simple setting of this case, the defense costs were incurred by a single policyholder, Aristone, which purchased coverage for every relevant

■ Our analysis is derived in large measure from the principles expressed by this Court in *Owens–Illinois, supra,* 138 *N.J.* at 478–80, 650 *A.*2d 974. There, the Court considered alternative methods for determining what constitutes an "occurrence" for purposes of determining which insurers must provide coverage to an insured named as a defendant in asbestos-related personal injury and property damage cases. *Id.* at 449–51, 474–75, 650 *A.*2d 974. Finding no guidance in the policy language at issue, the Court elected to adopt the "continuous trigger" theory for both personal injury and property damage claims. *Id.* at 478–79, 650 *A.*2d 974. The Court deemed coverage for personal injury to be triggered "on the inhalation of asbestos fibers and continu[ing] up to and including manifestation of an asbestos-related disease," *id.* at 445–51, 650 *A.*2d 974, and articulated a similar approach for claims based on damage to property, *id.* at 456, 650 *A.*2d 974. Under the continuous trigger theory, "when progressive indivisible injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a CGL policy." *Id.* at 478, 650 *A.*2d 974.

Having adopted the "continuous trigger" analysis, rather than a joint and several allocation method, the Court decided on a formula to allocate responsibility among the multiple insurers of a single insured. *See id.* at 474–76, 650 *A.*2d 974. Under joint and several allocation, a continuous injury over multiple years triggers obligations under only one policy, and the insurer who provides the targeted coverage is required to sue its co-insurers for contribution. *Id.* at 459–62, 650 *A.*2d 974. Instead, the Court chose a pro rata formula "related to both the time on the risk and the degree of risk assumed." *Id.* at 479, 650 *A.*2d 974. Under that

---

year. The underlying litigation was settled prior to trial within the limits of each policy and no excess carriers were involved. Accordingly, we need not reach the issue of allocation of defense costs when a litigant is uninsured or underinsured for a portion of the relevant period or address the obligations of excess carriers with respect to defense costs.

methodology, losses are allocated to "the carriers on the basis of the extent of the risk assumed, *i.e.*, proration on the basis of policy limits, multiplied by years of coverage." *Id.* at 475, 650 *A.*2d 974. The Court held that if a policyholder is uninsured or underinsured for the risk at issue by virtue of a decision "to assume or retain a risk"—a situation not presented by this case—some of the loss may be allocated to that policyholder. *Id.* at 479, 650 *A.*2d 974.

In *Owens–Illinois*, the Court anticipated that insurers would in some instances be compelled to file claims against the co-insurers of the common insured. *See id.* at 479, 650 *A.*2d 974. It held that when multiple insurance policies are implicated by the continuous-trigger analysis, all affected insurers "must respond to any claims presented to them and, if they deny full coverage, must initiate proceedings to determine the portion allocable for defense and indemnity costs." *Ibid.* The Court required policyholders to "co-operate in furnishing information concerning coverage," and directed trial judges to "take an active role in the management and resolution of such coverage controversies" aided, when necessary, by a special master. *Ibid.* Thus, the Court envisioned the litigation of direct claims between co-insurers to ensure that the policyholder's losses would be equitably allocated among its carriers. *See ibid.*

The allocation of responsibility among insurers in *Owens–Illinois* was premised upon several factors. The Court examined "the extent to which our decision will make the most efficient use of the resources available to cope with environmental disease or damage." *Id.* at 472, 650 *A.*2d 974. It invoked the need "to provide incentives that parties should engage in responsible conduct that will increase, not decrease, available resources." *Ibid.* The Court commented that "[s]preading the risk is conceptually more efficient" than imposing the entire loss on a single insurer. *See id.* at 472–73, 650 *A.*2d 974. It anticipated that its allocation formula would provide an incentive for policyholders to purchase insurance coverage every year. *See id.* at 472–74, 650 *A.*2d 974. Finally, the Court invoked equitable concepts, construing its ap-

proach to best serve "principles of simple justice." *See id.* at 473–76, 650 *A.2d* 974. The Court thus elected to adopt an allocation system that it deemed to be consistent with public policy and principles of fairness. *See ibid.*

Four years later, in *Carter–Wallace, supra,* 154 *N.J.* at 317, 327–28, 712 *A.2d* 1116 (1998), the Court applied the continuous trigger theory and the allocation formula of *Owens–Illinois* in different circumstances. In *Carter–Wallace,* the plaintiff insured filed a declaratory judgment action seeking reimbursement for indemnity and defense costs from more than twenty insurers for "progressive environmental property damage." *Id.* at 318–21, 712 *A.2d* 1116. Relying upon *Owens–Illinois* and *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.,* 978 *F.Supp.* 589 (D.N.J.1997), the Court directed the allocation of losses to primary and excess insurers that provided coverage for a given year. *Carter–Wallace, supra,* 154 *N.J.* at 326–27, 712 *A.2d* 1116. It held that losses would be allocated to "each policy in effect for [a particular] year, beginning with the primary policy and proceeding upward through each succeeding excess layer." *Id.* at 326, 712 *A.2d* 1116 (citing *Chem. Leaman, supra,* 978 *F.Supp.* at 606). The Court reasoned that this formula would serve the objectives of effective use of resources, " 'efficient response' " to the environmental insurance litigation and "simple justice" as discussed in *Owens–Illinois. Id.* at 327, 712 *A.2d* 1116 (quoting *Owens–Illinois, supra,* 138 *N.J.* at 473–74, 650 *A.2d* 974).

This Court and the Appellate Division have applied the principles of *Owens–Illinois* in various settings. *See, e.g., Benjamin Moore & Co. v. Aetna Cas. & Sur. Co.,* 179 *N.J.* 87, 91, 110, 843 *A.2d* 1094 (2004) (reaffirming *Owens–Illinois* allocation scheme to claim for injuries arising from distribution of contaminated lead paint); *Spaulding Composites Co. v. Aetna Cas. & Sur. Co.,* 176 *N.J.* 25, 29–31, 36–38, 42, 819 *A.2d* 410 (2003) (applying *Owens–Illinois* continuous trigger theory and *Carter–Wallace* vertical loss allocation by loss to invalidate a non-cumulation clause in context of cleanup of hazardous lead-containing waste); *Universal–Rundle*

*Corp. v. Commercial Union Ins. Co.*, 319 *N.J.Super.* 223, 228, 243–46, 725 *A.*2d 76 (App.Div.) (directing use of continuous trigger theory to determine respective liability resulting from cleanup costs of soil and groundwater contamination), *certif. denied,* 161 *N.J.* 149, 735 *A.*2d 574 (1999); *Sayre v. Ins. Co. of N. Am.*, 305 *N.J.Super.* 209, 211–12, 701 *A.*2d 1311 (App.Div.1997) (affirming trial court's use of continuous trigger liability analysis for progressive indivisible injury resulting from environmental contamination and cleanup of manufacturing site). The *Owens–Illinois* allocation methodology has thus been applied to a variety of disputes between policyholders and insurers, and among carriers.

We concur with the Appellate Division that recognizing an insurer's cause of action for contribution against a co-insurer for allocation of defense costs comports with *Owens–Illinois* and its progeny. Although the Court in *Owens–Illinois* considered an issue not raised by this case—co-insurers' obligations to indemnify their common insured—it envisioned a judicial determination of "the portion allocable [to each carrier] for defense and indemnity costs." *Owens–Illinois, supra,* 138 *N.J.* at 479, 650 *A.*2d 974. The Court recognized in *Owens–Illinois* that the insurer's obligation to indemnify the policyholder may engender contribution claims between insurers that share the same insured, independent of any right of subrogation to the claims of the insured. *See id.* at 478–79, 650 *A.*2d 974.[7] Like the obligation to indemnify the insured addressed in *Owens–Illinois* and *Carter–Wallace,* the obligation of successive insurers to pay the policyholder's defense costs can be readily determined by equitable allocation. Absent a right of contribution, a carrier that pays defense costs as they are incurred might alone bear a burden that should be shared. An

---

[7] "In a subrogation claim, 'the insurer is "substituted" for the insured regarding either all or some portion of the rights that the insured has to receive compensation from another source. An insurer asserting a subrogation right is usually viewed as "standing in the shoes" of the insured.' " *Franklin Mut. Ins. Co. v. Jersey Cent. Power & Light Co.,* 188 *N.J.* 43, 45 n. 1, 902 *A.*2d 885 (2006) (quoting 15 Eric Mills Holmes, *Holmes' Appleman on Insurance* § 113.1 at 384 n. 10 (2d ed. 2000)).

inequitable allocation of the cost of defense, like an unfair allocation of the obligation to indemnify, may justify a judicial remedy.

Moreover, the governing principles upon which the Court relied in *Owens–Illinois* and *Carter–Wallace* warrant the recognition of a claim for allocation of defense costs. First, permitting such a claim creates a strong incentive for prompt and proactive involvement by all responsible carriers and promotes the efficient use of resources of insurers, litigants and the court. If a carrier anticipates that it will be responsible for a portion of the defense costs, it is more likely to invest in a vigorous defense. With the collective resources of a litigant's insurers available at the early stages of a case, meritless claims can be challenged by motion and substantial claims can be more effectively defended.

Second, recognition of a direct claim by one insurer against another promotes early settlement. An insurer that anticipates paying an allocated portion of the policyholder's defense costs may factor those costs into a potential resolution of the underlying claim. Accordingly, a claim for apportionment of legal fees conserves the resources of all parties and the courts, and promotes New Jersey's strong policy in favor of the resolution of disputes. *See Willingboro Mall, Ltd. v. 240/242 Franklin Ave. L.L.C.*, 215 *N.J.* 242, 253–54, 71 *A.*3d 888 (2013) (citing *State v. Williams*, 184 *N.J.* 432, 441, 877 *A.*2d 1258 (2005)); *Herrera v. Twp. of S. Orange Vill.*, 270 *N.J.Super.* 417, 424, 637 *A.*2d 526 (App.Div.1993), *certif. denied*, 136 *N.J.* 28, 641 *A.*2d 1039 (1994). In the interest of fairness, however, a co-insurer's responsibility to pay for its share of defense costs should only extend up until the time the co-insurer settles.

Third, the allocation of defense costs creates an additional incentive for individuals and businesses to purchase sufficient coverage every year. If each insurer's obligation to contribute to a defense is apportioned in accordance with the scope of its coverage, as is the obligation to indemnify under *Owens–Illinois*, the policyholder is motivated to purchase coverage that is continuous, at a level commensurate to the policyholder's personal or

business risks. The Court in *Owens–Illinois*, addressing the indemnity obligation at issue, noted that "[f]uture actors would know that if they do not transfer to insurance companies the risk of their activities that cause continuous and progressive injury, they may bear that untransferred risk." *Owens–Illinois, supra,* 138 *N.J.* at 473, 650 *A.*2d 974. The prospect of legal fees and other defense costs creates an additional incentive for a policyholder to be adequately and continuously insured.

Fourth, the allocation of defense costs among all insurers that cover the risk, enforced by a right of contribution between the co-insurers of a common insured, serves the principle of fairness recognized in *Owens–Illinois*. *Ibid.* As this case illustrates, an insurer that refuses to share the burden of a policyholder's defense is rewarded for its recalcitrance, at its co-insurer's expense, unless the insurer who pays more than its share of the costs has an effective remedy. Recognition of an insurer's contribution claim against its co-insurer serves "the demands of simple justice." *Carter–Wallace, supra,* 154 *N.J.* at 322, 712 *A.*2d 1116 (citing *Owens–Illinois, supra,* 138 *N.J.* at 472–73, 650 *A.*2d 974). In short, an insurer's direct claim for allocation, asserted by an insurer that pays a disproportionate amount of the defense costs against other insurers of the same policyholder, promotes the principles underlying this Court's decisions in *Owens–Illinois* and *Carter–Wallace*.

In its decision affirming the trial court, the Appellate Division substantially relied upon California law. *Potomac, supra,* 425 *N.J.Super.* at 321–23, 41 *A.*3d 586. It discussed at length a California appellate decision, *Fireman's Fund, supra,* 77 *Cal. Rptr.*2d at 301–03. *Potomac, supra,* 425 *N.J.Super.* at 321–23, 41 *A.*3d 586. The California Court of Appeal held that "where two or more insurers independently provide primary insurance on the same risk," the carrier "who pays the loss or defends the lawsuit against the insured is entitled to equitable contribution from the other insurer or insurers, without regard to principles of equitable subrogation." *Fireman's Fund, supra,* 77 *Cal.Rptr.*2d at 301. A

release between the insured and the insurer that did not pay defense costs is not a bar to such a claim. *Ibid.*

As PMA observes, there are important distinctions between New Jersey and California law with respect to the method by which insurance coverage is apportioned when primary and excess carriers insure a given risk. New Jersey has adopted a "verti-cal[ ]" pro rata methodology by which coverage for a particular year is allocated first to the primary carrier for that year and then through each succeeding excess layer. *Carter–Wallace, supra,* 154 *N.J.* at 326–27, 712 *A.*2d 1116; *accord Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.,* 177 *F.*3d 210, 218 & n. 11 (3d Cir.1999). In contrast, California adheres to a "horizontal" alloca-tion system, whereby "'*all* primary insurance must be exhausted before a secondary insurer will have exposure.'" *Padilla Constr. Co. v. Transp. Ins. Co.,* 150 *Cal.App.*4th 984, 58 *Cal.Rptr.*3d 807, 809 n. 1 (2007) (quoting *Cmty. Redevelopment Agency v. Aetna Cas. & Sur. Co.,* 50 *Cal.App.*4th 329, 57 *Cal.Rptr.*2d 755, 761 (1996)).

That distinction is significant to the states' respective allocation schemes and to the merits of indemnity claims asserted by insur-ers in each jurisdiction. It does not, however, mean that a contribution claim for defense costs is inherently incompatible with New Jersey's methodology for allocating the burden of indemnifying the insured.[8] As the Appellate Division correctly

---

[8] As the Appellate Division explains, PMA's reliance on *Childs, supra,* 108 *N.J.* at 515, 531 *A.*2d 723 is misplaced. *See Potomac, supra,* 425 *N.J.Super.* at 323–24, 41 *A.*3d 586. PMA cites *Childs* for the proposition that a claim for contribution by one insurer against another is likely invalid. The Court in *Childs* discussed its "serious doubts that any right of contribution exists" for a non-settling carrier in an uninsured motorist case against a carrier that had settled for less than its pro rata share where both policies were concurrent. *Childs, supra,* 108 *N.J.* at 515, 531 *A.*2d 723. The Court however, had expressed that its holding was in the context of a *pro tanto* rule whose goal was the full recovery to the plaintiff and the preservation of statutory liability coverage minimums in the uninsured motorist insurance scheme. *Id.* at 512–13, 531 *A.*2d 723. Moreover, the Court in *Childs* did not make a definitive declaration that such an action

noted, the equitable principles on which California's rule is based are similar to those expressed by this Court in *Owens–Illinois. Potomac, supra,* 425 *N.J.Super.* at 323–24, 41 *A.*3d 586 (citing *Owens–Illinois, supra,* 138 *N.J.* at 470–71, 650 *A.*2d 974; *Fireman's Fund, supra,* 77 *Cal.Rptr.*2d at 309). Although it relied upon California precedent, the Appellate Division promoted the principles set forth in *Owens–Illinois* and *Carter–Wallace* when it decided this case. *Ibid.* Those principles guide our holding here.

We concur with the trial court and the Appellate Division that OneBeacon was properly permitted to assert a direct claim against PMA for contribution of a portion of the defense costs paid on Aristone's behalf. Given the continuous property damage that spanned a period during which PMA provided coverage, PMA's obligation to defend as well as indemnify the parties' common insured and OneBeacon's payment in excess of its share of the defense costs, the trial court properly allocated sixteen percent of the defense costs to PMA. We affirm the trial court's exercise of its discretion.

## V.

We also affirm the decision of the trial court and the Appellate Division rejecting PMA's contention that its release with Aristone barred OneBeacon's contribution claim.

The trial court's determination of this issue was premised on the terms of the March 2, 2007 release signed by Aristone and PMA and the trial testimony of witnesses who participated in the drafting of that release. The language of the release, in which OneBeacon played no role, does not provide support for the notion that OneBeacon intended to waive its right of contribution against PMA.

---

would be prohibited, but simply deferred the issue for further consideration in an appropriate setting. *Id.* at 515, 531 *A.*2d 723.

The release recites that "Aristone and PMA"—and no other party—"wish[ ] to resolve fully and finally all aspects of the arbitrated dispute." Moreover, the definition of the releasing party, Aristone, does not purport to include OneBeacon, or any other entity providing insurance to Aristone for the *Evesham* claim. The release extinguishes "all claims by Aristone concerning PMA's obligation to pay the attorneys' fees and costs incurred in defense of the claims asserted in the *Evesham* claim and/or Aristone's obligation to pay any self-insured retention or deductible" in that claim, but its language does not encompass OneBeacon's right to seek contribution against PMA on its own behalf. The release specifically excludes from Aristone's obligations any duty to defend and indemnify PMA against claims derivative of the *Evesham* claim "by an insurance carrier as a claimant or as a true party in interest to a claim," thus underscoring the parties' shared anticipation that PMA's co-insurers could bring a separate action in the future.

The trial testimony provides further support to the trial court's construction of the March 2, 2007 release. As the trial court noted, PMA did not insist that OneBeacon be a signatory to its release with Aristone. Based on the testimony, the court found that PMA was aware when it agreed to the terms of the release that OneBeacon would not sign it, that PMA nevertheless hoped that Aristone's signature would bar OneBeacon's contribution claim, and that there was no meeting of the minds between OneBeacon and PMA regarding the disposition of the contribution claim. We conclude the trial court's findings were supported by substantial credible evidence and affirm those findings on appeal. *See Cesare, supra,* 154 *N.J.* at 411–12, 713 *A.*2d 390 (citing *Rova Farms, supra,* 65 *N.J.* at 484, 323 *A.*2d 495).

In short, the evidence reviewed by the trial court supports its finding that OneBeacon's contribution claim against PMA was not barred or limited by the March 2, 2007 release between PMA and its insured, Aristone. We therefore defer to that finding.

## VI.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS and PATTERSON and Judge RODRÍGUEZ (temporarily assigned)—6.

*Not Participating*—Judge CUFF (temporarily assigned).